544 So.2d 1384 (1989)
James W. WILMOTH and Charlotte Elaine Wilmoth
v.
PEASTER TRACTOR CO. OF LEXINGTON, INC.
No. 58465.
Supreme Court of Mississippi.
May 31, 1989.
Wm. Andy Sumrall, Jackson, Charles B. Colvin, New Orleans, La., for appellants.
Stephen P. Kruger, Michael V. Ward, Upshaw, Williams, Biggers, Page & Kruger, Jackson, for appellee.
Before DAN M. LEE, ANDERSON and BLASS, JJ.
ANDERSON, Justice, for the Court:
This case involves an appeal from a products liability suit from the Circuit Court of Hinds County. James W. Wilmoth (Wilmoth), appellant here and plaintiff below, sustained, among other things, a fractured pelvis and urologic injuries from an accident involving an 856 International Harvester Farmall tractor (tractor or 856 Farmall). He purchased the tractor from Peaster Tractor Company of Lexington, Inc. (Peaster), appellee here and defendant below. Wilmoth initially filed suit against both manufacturer and seller alleging that the brakes on the tractor caused the accident. Wilmoth and the manufacturer settled outside of court. Wilmoth proceeded against Peaster on the basis of three theories: (1) implied warranty of merchantability; (2) express warranty; and (3) negligence. The jury returned a verdict in favor of Peaster. Aggrieved by the verdict, Wilmoth timely appealed and assigned the following as errors in the lower court proceedings:
I. THE VERDICT OF THE JURY WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE IN REGARDS TO IMPLIED WARRANTY OF MERCHANTABILITY.
II. THE JURY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE IN REGARDS TO EXPRESS WARRANTY.
III. THE JURY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE IN REGARDS TO NEGLIGENCE ON THE *1385 PART OF PEASTER TRACTOR COMPANY.
Finding no merit to these assignments, we affirm the ruling of the lower court.

I.
On Friday, May 28, 1978, Wilmoth was using the 856 Farmall he purchased from Peaster to clear an area behind his house trailer in Coxburg, Mississippi. As he moved a tree, the tractor's rear tires got stuck in a slope on a hill at a ten (10) or fifteen (15) degree downhill angle. He knocked the gears in neutral, pulled the "park lock" down, and killed the engine on the tractor.
Wilmoth then requested help from his neighbor, Homer Chisolm (Chisolm), who also owned an 856 Farmall. They hooked the two tractors together with a chain and Chisolm pulled Wilmoth out of the hole, approximately 15 or 20 feet, but not all the way up the incline. Wilmoth then applied his brakes, knocked his tractor gear into neutral, killed the engine and put the park lock down on it. He unhooked the chain from the two tractors and replaced them in the tool box on the tractor. He and Chisolm stood at the site, talked, and drank coffee for a "few minutes."
Wilmoth testified that as he remounted on the left side of the tractor the following sequence of events occurred:
I put the left foot on the bottom step and reached and got the steering wheel in my left hand and started up on it. Just as I hit the floor of the deck plate of the tractor it started to move. I was in a position to sit down and I immediately did and hit the brakes and nothing happened. I immediately hit the ignition on trying to crank it and about that time I hit the hole and over the front of it I went. I don't know if the tractor cranked or not.
* * * * * *
One of the wheels hit one of the holes that he (Chisolm) had just pulled me out of, and the jar kicked me over the front of it (the tractor). The seats that's mounted on those tractors have springs under them and they have a hydraulic cylinder on them. When that seat hit the bottom of it come right back up and threw me over the tractor.
* * * * * *
I hit the ground in front of the tractor and I seen it was going to run over me so I threw my left arm up and tried to protect my head. I seen that front wheel was going to get me on the head. It rolled over me and then I rolled twice trying to get away from the back wheel but I just couldn't get away from it. The back wheel rolled over my mid-section.
* * * * * *
It (the tractor) was rolling downhill.
At the time of the tractor's purchase, Wilmoth lacked experience with tractors; but occasionally he had used his neighbor Chisolm's tractor. In order to trade-out parts, he decided to purchase an 856 like Chisolm's. Subsequently, Chisolm informed Wilmoth that Peaster's had acquired an 856 Farmall, and Chisolm initially contacted Peaster about the tractor on Wilmoth's behalf.
Prior to the purchase, Wilmoth and Chisolm inspected and test drove the tractor. Wilmoth testified that he talked to the mechanics about the tractor's condition and told them he wanted to know of any needed repairs. The mechanics assured Wilmoth that the tractor was in good condition because the previous owner had recently completed an overhaul of it. Specifically, the mechanics told Wilmoth the tractor was in "field ready condition," and did not inform him of any problems with the park lock or brakes.
Wilmoth testified that Peaster's manager, Arthur Eugene Austin, assured him that the tractor was "pretty sound." Thus, based on Chisolm's satisfaction with the tractor, and relying on assurances of Peaster's personnel that it was in sound condition, Wilmoth decided to purchase it.
Repair records offered into evidence showed that no work was performed on the tractor's brake system or park lock after Wilmoth's purchase.
*1386 Both Wilmoth and Peaster offered testimony by experts who first inspected the tractor approximately two (2) to four (4) years after the accident. Wilmoth's experts' inspections revealed that the accident was caused by a malfunction with the turnbuckle of the braking system. The defect could not be detected, however, without first removing the floor plate of the tractor; but the experts were of the opinion that the defect existed at the time Wilmoth purchased the tractor and subsequently had the accident.
Expert Thomas E. Nelson (Nelson), an employee of Navistar International Corporation (previously International Harvester), testified that in 1977 International Harvester changed the design of the park lock on the 856, and the turnbuckle was replaced by a solid rod. This "design change" eliminated the turnbuckle linkage and the potential for any other maladjustment. Thus, the use of a solid rod rather than the linkage, would have prevented the park lock's malfunction, and consequently the accident.
Nelson could not state, however, whether Peaster failed in any respect to discover the condition of the tractor's brakes or park lock. He concluded only that the condition he observed explained the behavior of the tractor as described by Wilmoth; and he found nothing in the repair records to indicate that any changes were made to the tractor's condition after the purchase.
Peaster's expert, Fred Shuman (Shuman), testified that in his opinion the problems discovered by Wilmoth's experts did not exist prior to the accident because of the existence of "too many variables." Specifically, (1) the tractor drove satisfactorily when tested by Wilmoth and Chisolm prior to the accident; (2) the park lock worked on a number of occasions, even up to just prior to the accident; and (3) the intervening time period between the accident and the first inspection by Wilmoth's experts. Consequently, Shuman testified that it was impossible to determine at what point in time a malfunction existed with the tractor's brake and park lock system.
Tom Kennedy (Kennedy), an expert in tractor dealership, testified that Peaster did what any normal tractor dealer would have done under the circumstances. He stated that if he dealt with a farmer who he knew and trusted, and the farmer failed to inform him about any malfunction with the brakes, then he would assume the brakes were okay. In such a case, he would just visually inspect the tractor to ensure the tires were up and there were no cosmetic injuries. Such an inspection would exclude the brake and park lock systems, and would not involve test driving the tractor.

II.
Wilmoth's three assignments of error challenge the weight of the evidence in support of the jury verdict. The Court's scope of review is, therefore, limited. The evidence is considered in the light most favorable to the appellee, giving that party the benefit of all favorable inferences that reasonably may be drawn from the evidence. The Court is required to reverse and render, only if the facts considered in this light point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict. If, however, the evidence in support of the verdict is of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions then affirmance is required. Fitzner Pontiac-Buick-Cadillac v. Smith, 523 So.2d 324, 326 (Miss. 1988).
When evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony. Dixon v. State, 519 So.2d 1226, 1228 (Miss. 1988); Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1980); Paulk v. Housing Authority of City of Tupelo, 228 So.2d 871 (Miss. 1969). See also, Holliman v. Lucas, 202 Miss. 463, 32 So.2d 259 (1947). The jury may give whatever weight it chooses to a witness' testimony or other evidence. The reviewing court cannot, therefore, set aside a verdict unless it is clear that the verdict is a result of prejudice, *1387 bias or fraud, or is manifestly against the weight of credible evidence. Dixon, supra.

III.
In the case sub judice, the testimony presented a case for determination by the jury, and only the jury could resolve the conflicting facts. The record does not reveal the testimony was incredible. The jury obviously chose to believe Peaster's side of the story rather than Wilmoth's. Such belief is not a cause for reversal. Therefore, in accordance with the foregoing case law, the ruling of the lower court is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.