# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 98-CA-00508-SCT

*IN RE: THE ESTATE OF ELOISE W. DABNEY, DECEASED: DAVID H. DABNEY, ELOISE DABNEY LAUTIER AND MARY DABNEY NICHOLLS*

*v.*

*FREDDIE D. HATAWAY, CHERYL LINEBERGER, JANIE HATAWAY, RACHAEL HATAWAY AND FRED DABNEY*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/1998 |
| TRIAL JUDGE: | HON. H. GERALD HOSEMANN |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | KENNETH B. RECTOR |
| ATTORNEYS FOR APPELLEES: | JAMES D. BELL |
| | EDUARDO ALBERTO FLECHAS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | AFFIRMED - 08/12/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: 09/02/1999 | |

BEFORE PITTMAN, P.J., McRAE AND SMITH, JJ.

SMITH, JUSTICE, FOR THE COURT:

## STATEMENT OF THE CASE

¶1. This case involves the contest of the will of Eloise Dabney. The Contestants include Freddie D. Hataway, daughter of Eloise Dabney, along with her children, Cheryl Lineberger, Janie Hataway, Rachel Hataway, and Fred Dabney. The Proponents of the will are David H. Dabney, Eloise Dabney Lautier and Mary Dabney Nicholls, which are the other children of Eloise Dabney. The Proponents of the will appeal the 12-0 jury verdict in favor of the Contestants from the Warren County Chancery Court.

### Statement of the Facts

¶2. On April, 17, 1954, F.Y. Dabney purchased a large block of mineral interests in Mississippi, Louisiana, Alabama, and Florida from a George Gilbert and formed a

partnership known as the Dabney Company. The original partners were F.Y. Dabney, his wife Eloise Dabney, and his four children Mary Dabney Nicholls, David Dabney, Eloise Dabney Lautier (the "Proponents")and Freddie Dabney Hataway (the "Contestant"). F.Y. Dabney transferred to B.C. Owens 5% of the net cash profits of the Dabney Company. F.Y. Dabney died in 1956 leaving his wife and four children as the surviving partners in the company.

¶3. In 1956, Leo Boolos, a Certified Public Accountant in Vicksburg, began assisting Mrs. Dabney with financial and tax matters. Over the years, Boolos became an advisor and confidant to Mrs. Dabney. Oil company checks were mailed to Boolos, who deposited and accounted for the funds. Oil companies even contacted him to arrange leases. When Mrs. Dabney would receive inquiries about the company, she would generally refer those inquiries to Boolos.

¶4. In 1960, Boolos obtained two assignments of portions of B.C. Owens's net cash profit participating interest. The effect of these assignments was that Owens would receive 4.5% of the net cash profits derived from royalties, bonuses and similar income, and Boolos would receive .5% of the net cash profits. However, in the event of a sale, Boolos would receive 2.75% of the net cash profits to only 2.25% for Owens.

¶5. In May of 1974 a new partnership agreement was prepared. Mrs. Dabney and the four children remained partners, but she also had a special power of attorney to sell or lease Dabney Company properties with David Dabney and Leo Boolos as successors. Through the years, the Contestant had numerous run-ins and disputes with Boolos over financial decisions, powers of attorney. The first such dispute arose in 1981 when a sale of assets took place. When Contestant asked Boolos to produce information regarding his sources of information, Boolos responded that he was not at liberty to produce this information.

¶6. In another request for information, the Contestant asked Boolos for a list of the original Dabney Company properties. Boolos responded that the Contestant had requested more than any partner should ask for and that these documents were not readily available. Many other requests were made to Boolos for certain information; however, the information was never obtained by the Contestant.

¶7. In 1995, David signed numerous medical records for Mrs. Dabney as "Eloise W. Dabney by David Dabney as her guardian or conservator." Less than a year before Mrs. Dabney's death, David signed a medical record for his mother because she was "unable to sign due to dementia." On September 20, 1995, Dr. Daniel Edney gave Mrs. Dabney a diagnosis of "progressive senile dementia." All of Mrs. Dabney's nurses testified that Mrs. Dabney was confused and agitated.

¶8. Mrs. Dabney was completely bedridden the last years of her life and died on August 22, 1996, at the age of 90 years. Ten days before her death, Mrs. Dabney executed a new will prepared for her by Boolos. This new 1996 will omitted the Contestant as a beneficiary.

¶9. The Proponents filed the 1996 will for probate in the Warren County Chancery Court, and the Contestant challenged the will. The trial court granted partial summary judgment to the Proponents on the issue of mental capacity. The remaining issues were tried to a jury in January 1998, and the jury returned a 12-0 verdict for the Contestant. A motion for judgment notwithstanding the verdict and for new trial was made by the Proponents and was denied.

¶10. Aggrieved by the trial court's judgment, the Proponents appeal and assign three errors, as follows:

> **I. DID THE TRIAL JUDGE ERR BY FAILING TO GRANT A DIRECTED VERDICT OR A PEREMPTORY INSTRUCTION TO THE APPELLANTS (a) ON THE ISSUE OF THE EXISTENCE OF A CONFIDENTIAL RELATIONSHIP BETWEEN THE TESTATRIX AND DAVID DABNEY AND/OR LEO BOOLOS OR (b) ON THE ISSUE OF WHETHER OR NOT THE WILL WAS PROCURED BY UNDUE INFLUENCE?**
>
> **II. WAS THE 1996 LAST WILL AND TESTAMENT OF ELOISE DABNEY A PRODUCT OF FRAUD OR MISREPRESENTATION?**
>
> **III. DID THE TRIAL JUDGE ERR BY FAILING TO GRANT PROPONENTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL?**

## STANDARD OF REVIEW

¶11. "In reviewing a jury verdict, this Court resolves all conflicts of evidence in the appellee's favor and determines all reasonable inferences from testimony given towards the appellee's position. Reversal occurs only where the facts presented are so overwhelming in the appellant's position that reasonable jurors could not have found for the appellee." *Thompson Mach. Commerce Corp. v. Wallace*, 687 So.2d 149, 151-52 (Miss. 1997) (citations omitted). When an appellant challenges the sufficiency of evidence to support a jury's verdict, the appellate court's scope of review is limited. *Parker v. Thornton*, 596 So.2d 854, 857 (Miss. 1992). All evidence must be reviewed in the light most favorable to the appellee. *Id*. An appellate court may only reverse a jury verdict when the facts considered in that light point so overwhelmingly to the appellant's position that reasonable men could not have arrived at a contrary verdict.

***Wilmoth v. Peaster Tractor Co. of Lexington, Inc.***, 544 So.2d 1384,1386 (Miss. 1989). In the event that evidence is conflicting, a jury is the sole judge of the credibility of witnesses and the weight of their testimony. ***Wilmoth***, 544 So.2d at 1386 (citing ***Dixon v. State***, 519 So.2d 1226 (Miss. 1988)).

## LEGAL ANALYSIS

**I. DID THE TRIAL JUDGE ERR BY FAILING TO GRANT A DIRECTED VERDICT OR A PEREMPTORY INSTRUCTION TO THE APPELLANTS (a) ON THE ISSUE OF THE EXISTENCE OF A CONFIDENTIAL RELATIONSHIP BETWEEN THE TESTATRIX AND DAVID DABNEY AND/OR LEO BOOLOS OR (b) ON THE ISSUE OF WHETHER OR NOT THE WILL WAS PROCURED BY UNDUE INFLUENCE OR MISREPRESENTATION?**

¶12. A confidential relationship exists when a dominant over-mastering influence controls over a dependent person or trust, justifiably reposed. ***Murray v. Laird***, 446 So.2d 575, 578 (Miss. 1984). It is well established that the contestant has the burden of establishing the existence of a confidential relationship. ***Norris v. Norris***, 498 So.2d 809, 813 (Miss. 1986). Factors to be considered in determining if and when a confidential relationship exists, include: (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another. *See **In re Estate of Grantham***, 609 So.2d 1220, 1224 (Miss. 1992); ***Costello v. Hall***, 506 So.2d 293 (Miss. 1987); ***Hendricks v. James***, 421 So.2d 1031 (Miss. 1982).

¶13. One of the first factors in determining a confidential relationship is whether one person has to be taken care of by others. David Dabney and Leo Boolos did take care of the testatrix, on both personal and business levels. Also, the testatrix had to be taken care of by other individuals due to being bedridden. Mrs. Dabney had many nurses over the years. The last two years of her life, Mrs. Dabney was visited twice daily by nurses' aides. Also, according to David's testimony, he would often run errands for his mother, and before she became bedridden, he would drive her places. David also testified that, to the best of his knowledge, on two occasions he signed checks on his mother's account. He would deposit money for and on behalf of his mother and also pay bills for her. There was also testimony by Angela Jordan, one of Mrs. Dabney's nurses, that David signed several documents for his mother while she was in the hospital because she was unable to sign for herself. With regard to Leo

Boolos, testimony showed that Boolos tended to the Dabney business finances. According to information showed at trial, Mrs. Dabney did have to be taken care of both physically by her nurses, and she also had help with her business affairs.

¶14. Another factor in determining a confidential relationship is whether the testatrix is physically or mentally weak. According to the records, the testatrix was diagnosed with progressive senile dementia and cerebral atrophy, and there was testimony relating to the fact that she was forgetful, depressed, agitated, and easily confused. Three months before she died, she complained of losing her mind. With regard to being physically weak, the testatrix was confined to a bed for the last two years of her life. Testimony from her daughter Mary indicated that three days before her death, Mrs. Dabney was not able to write a check.

¶15. Next, and a third factor to consider, the testatrix was of advanced age and poor health. When the testatrix died on August 22, 1996, she was 90 years old. As indicated by various medical records entered into evidence, the testatrix was also in poor health and bedridden for the last two years of her life.

¶16. Another factor in determining a confidential relationship is whether a power of attorney was executed. A power of attorney was executed on July 21, 1994, empowering David Dabney to act as her agent and attorney-in-fact. The Proponents argue that a power of attorney is not enough to establish a confidential relationship. That is correct. A power of attorney does not, standing alone, evidence a confidential relationship. ***Costello v. Hall***, 506 So.2d at 297. However, more evidence of a close relationship can in fact create a presumption of a confidential relationship. *Id.* As mentioned above, there are other factors that have been testified to in regards to a confidential relationship. For example, David wrote checks for Mrs. Dabney, he deposited money into her account, he provided transportation for her, he ran errands for her, she was in a mentally and physically weak state and approximately 90 years old. Boolos handled her business affairs. Mary, one of Mrs. Dabney's daughters, testified that Boolos also took care of business finances. These factors, along with the existence of a power of attorney, help in determining that a confidential relationship did exist.

¶17. The Proponents argue that, although Mrs. Dabney was bedridden, "she was fully mentally competent up until the date of her death. However, to the contrary, the record indicates that Mrs. Dabney was diagnosed with progressive senile dementia, and there was testimony relating to the fact that she was forgetful, depressed, agitated, and easily confused. Also, David Dabney signed a hospital record for his mother as her legal guardian because the patient was "unable to sign due to dementia." Mrs. Dabney's records from January 31, 1995, show a possible stroke and state, "There is evidence of cerebral atrophy . . . ." On July 31, 1994, at 1:30 a.m. Mrs. Dabney was screaming,

"I'm having a baby, please give me something for pain." On September 20, 1995, a little less that one year before her death, Mrs. Dabney was diagnosed with "progressive senile dementia." Three months before she died, she complained to one of her nurses that she was losing her mind. According to the record, Mrs. Dabney was not "fully mentally competent."

¶18. Based on the above evidence and having considered established factors in regards to a confidential relationship, we are of the opinion that a confidential relationship did exist between David, Boolos and Eloise Dabney, and the trial court was correct in so finding.

¶19. Now, with regard to the second part of issue one, we must decide whether there was adequate proof of undue influence. Given the finding that a confidential relationship does exist between the beneficiary and the testatrix and that the beneficiary has been actively concerned in some way with the preparation or execution of the will, the law raises a presumption that the beneficiary exercised undue influence over the testatrix, and casts upon the beneficiary the burden of disproving undue influence by clear and convincing evidence. *Croft v. Alder*, 237 Miss. 713, 115 So. 2d 683, 686 (1959). *See Also,* **In Re Estate of Smith**, 722 So. 2d 606 (Miss. 1998). In the event that the proponents of the will do not meet this burden, the will must be held invalid. *Harris v. Sellers*, 446 So.2d 1012, 1015 (Miss. 1984). To overcome the presumption of undue influence, the proponents must show (a) good faith on the part of the beneficiary, (b) the testatrix's full knowledge and deliberation of the consequences of her actions, and (c) the testatrix received the advice of a competent person disconnected from the beneficiary and devoted wholly to him. *Murray*, 446 So.2d at 578.

¶20. There must first be good faith on the part of the beneficiary. Boolos did not act in good faith in regards to drafting a new will for Mrs. Dabney. He admitted that he made several changes to the will that were unauthorized by the Testatrix. He added provisions to the old will and also took out Freddie's children without permission from Mrs. Dabney. When asked how he came about making these changes, Boolos testified, "I don't remember." Clearly, Boolos was not acting in good faith by changing Mrs. Dabney's will without her knowledge. When she signed the will, she was under the impression that all of the provisions were the same except the part that excluded Freddie.

¶21. Next, we must determine if Mrs. Dabney acted with full knowledge and deliberation of the consequences of her actions. On August 12, 1996, the testatrix signed her Last Will and Testament. Prior to the execution of this new will, the testatrix had given instructions to Leo Boolos concerning the drafting of a new will, in which she wanted to leave out her daughter, Freddie Hataway. However, Boolos did not draft

a will identical to her previous will with the exception of Freddie Hataway being left out. Instead, Boolos also left out Freddie's children and added other provisions. Mrs. Dabney assumed that all of the provisions in the will were identical to her previous will, with the exception of Freddie Hataway. So, in accordance, Mrs. Dabney scanned the majority of the will and only read the parts that pertained to Freddie Hataway. More importantly, Mrs. Dabney also asked David if this was the will she wanted, and David answered in the affirmative. In fact, this was not true. Without being fully aware of the new provisions of the will and the additional deletions by Boolos, Mrs. Dabney could not have acted with full knowledge and deliberation. Clearly, suspicious circumstances existed here. "Suspicious circumstances surrounding the creation of the will also raise the presumption." *Pallatin v. Jones*, 638 So. 2d 493, 495 (Miss. 1994).

¶22. The last factor that must be shown to overcome the presumption of undue influence is that the testatrix received the advice of a competent person disconnected from the beneficiary and devoted wholly to her. *In re Will and Estate of Varvaris*, 477 So.2d 273, 278 (Miss. 1985). Leo Boolos was not competent to make the will, was not unconnected to the beneficiary, and was not completely devoted to Mrs. Dabney. The Contestant argues that Leo Boolos was not competent because he was engaging in the illegal practice of law, prohibited by Miss. Code Ann. § 73-3-55 (1995), by preparing the will for Mrs. Dabney. Miss. Code Ann. § 73-3-55 (1995), outlaws the practice of law without a license. It provides, in pertinent part, that:

> It shall be unlawful for any person to engage in the practice of law in this state who has not been licensed according to the law. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished in accordance with the provisions of section 97-23-43. Any person who shall for fee or reward or promise, directly or indirectly, write or dictate any paper or instrument of writing, to be filed in any cause or proceeding pending, or to be instituted in any court in this state, or give any counsel or advice therein, or who shall write or dictate any bill of sale, deed of conveyance, deed of trust, mortgage, contract, or last will and testament, or shall make or certify to any abstract of title or real estate other than his own or in which he may own an interest, shall be held to be engaged in the practice of law....

Miss. Code Ann. § 73-3-55 (1995).

¶23. In *Darby*, this Court held that a chancery court clerk who was not licensed to practice law while she performed acts such as drawing deeds, deeds of trust, notes, bills of sale, and real property title certificates was guilty of the unauthorized "practice of law." *Darby v. Mississippi State Board of Bar Admissions*, 185 So.2d 684, 686 (Miss. 1966). Further, this Court also held "courts have inherent authority, independent of statute, to decide what acts constitute the practice of law." *Id.* at 688. Although this

Court has never addressed the specific issue presented here, other courts have addressed this issue and have held that the preparation of a will for another by a nonlawyer is in fact the illegal practice of law. *See, e.g., Grievance Comm. v. Dacey*, 222 A.2d 339 (Conn. 1966)(drafting of legal documents, including wills, is the practice of law and must be done by an attorney); *In re Estate of Margow*, 390 A.2d 591, 597 (N.J. 1978)(legal counseling by proponent, a former legal secretary, of testatrix as to her estate planning constituted unauthorized practice of law); *Grievance Comm. State Bar of Texas v. Coryell*, 190 S.W.2d 130 (Tex. Civ. App. 1945)(the drawing of wills done by notary public, not licensed as an attorney, constituted illegal practice of law). Therefore, since he was not licensed to practice law, Boolos was clearly not competent as a matter of law to prepare the will.

¶24. In addition, Boolos was not unconnected to the beneficiary. In fact Boolos and David Dabney were "friends" and business partners. Mr. Dabney also testified that Boolos handled his "personal work." In any regard, Boolos and Dabney were connected, at least in a business sense. Therefore, Boolos was not devoted solely to Mrs. Dabney. Based on the record, the Proponents did not overcome the presumption of undue influence because they did not satisfy the three elements set out in *Murray*, 446 So.2d at 578. Also, in *Jamison v. Jamison*, the Court, in addressing the issue of undue influence, stated:

> It follows, from the very nature of the thing, that evidence to show undue influence must be largely, in effect, circumstantial. It is an intangible thing, which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to that fact. He observes, too, the same precautions if he seeks by cajolery, flattery, or other methods to obtain power and control over the will of another, and direct it improperly to the accomplishment of the purpose which he desires....

96 Miss. 288, 298, 51 So. 130, 131 (1910), (quoting *Blackman v. Edsall*, 68 P. 790, 792 (Colo. 1902)): *See also*:*Young v. Martin*, 239 Miss. 861, 125 So.2d 734, 737 (1961), (collecting cases); *Sanders v. Sanders*, 126 Miss. 610, 89 So. 261 (1921); *Woodville v. Pizzati*, 119 Miss. 442, 81 So. 127 (1919).

¶25. After establishing that a confidential relationship existed, a presumption of undue influence is created. It was the burden of the proponents to overcome the presumption. On the evidence the jury was free to conclude that the necessary elements of overcoming the presumption of undue influence were not satisfied, and that the evidence was sufficient to support the jury's finding that there was undue

influence in the creation of Mrs. Dabney's 1996 will.

## II. WAS THE 1996 LAST WILL AND TESTAMENT OF ELOISE DABNEY THE PRODUCT OF FRAUD OR MISREPRESENTATION?

¶26. In the case sub judice, there were instances of both fraud in the execution of a will and misrepresentation. Eloise Dabney informed David Dabney that she wanted to execute a new will and that he should call Leo Boolos. She indicated to Boolos that she wanted a new will drawn up that would leave Freddie Hataway out of her will. Boolos prepared the will.[1]

¶27. Mrs. Dabney told Boolos to create a codicil to the will that would leave Freddie out. However, Boolos informed Mrs. Dabney ". . . you have so many codicils, maybe it would be better if we just redrafted the whole thing from top to bottom." Boolos agreed that he would copy the previous will with the exception to provisions regarding Freddie. According to Mrs. Dabney's request, the exclusion of Freddie was the only change that should be made to the will. In contrast to this request, Boolos did more than copy the old provisions of the will. He made several subsequent changes to the will that Mrs. Dabney did not authorize. First, Boolos added a provision in the will that left $5,000 to Lillie Mae Thomas, the Dabney's maid. However, Boolos never testified that he was informed to add Lillie to the new will. When asked if Mrs. Dabney told him to make the addition, he said, "she may have . . . ." Boolos also testified that he knew Mrs. Dabney wanted the will to be exactly the same, with the exception of the exclusion of Freddie. Second, another change made to the new will concerned Fred Dabney.[2] Boolos decided to leave Fred out of this 1996 will. Boolos again testified that Mrs. Dabney had not said anything to him concerning Fred. *Id.* Boolos testified that he "felt" that Mrs. Dabney intended to leave Fred out. *Id.* Third, there had been a sofa and end tables mentioned in the previous will; however, they were both excluded from the new 1996 will. Boolos testified that he did not know whether he made an error or whether he excluded these items on purpose. Finally, Freddie's daughters were provided for in the previous wills. Mrs. Dabney had left silver pieces to one of Freddie's daughters and to one of Eloise's daughters. The new 1996 will that Boolos prepared gave David Dabney the sole authority to leave the silver to one of the granddaughters, not to both of them. When asked how this change came about, Boolos testified that, "I don't remember." According to Boolos's testimony, approximately four unauthorized changes were made to Mrs. Dabney's original will.

¶28. Fraud in the execution of a will exists when there has been a misrepresentation to the testator about the nature or content of the will. *In re Estate of Vick*, 557 So.2d at 767. As mentioned above, there were several changes made in the 1996 will of which Mrs. Dabney was unaware. David Dabney picked up the will from Boolos and took it to his mother. When Mrs. Dabney received the new will, she only read the provisions

that had to do with Freddie. She "scanned" the rest of it. Mrs. Dabney asked David, "Is this the will I wanted?" David told her that it was. David testified that he assumed everything in the will, with the exception of Freddie's provisions, was the same as the previous will. He also testified that his mother assumed the same thing. According to this testimony, Mrs. Dabney was mistaken as to the contents of her will. She believed that everything was the same except for the provisions pertaining to Freddie. She was never made aware, by David or by Leo, that several additional changes had been made. Again, Boolos had agreed to copy the provisions of the previous will. Therefore, Mrs. Dabney was under the mistaken impression that both wills were the same. She signed the 1996 will under the misrepresentation as to the contents of the will. As the lower court held, the 1996 will was appropriately held invalid because it was a product of fraud in the execution of a will.

### III. II. DID THE TRIAL JUDGE ERR BY FAILING TO GRANT PROPONENTS' MOTIONFOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL?

¶29. The jury in this case, after hearing all witnesses and evidence, returned a unanimous 12-0 verdict in favor of the contestant, Freddie Hataway. Freddie Hataway had the burden of proving that a confidential relationship existed between David, Boolos, and Mrs. Dabney. The jury determined that, based on the evidence presented, the contestant satisfied her burden of proving a confidential relationship by satisfying the established factors. When a confidential relationship is found to exist, a presumption of undue influence is raised that must be overcome by the proponents of the will. The presumption can be overcome by satisfying the established factors. The jury, based on all evidence and witnesses, determined this presumption had not been overcome.

¶30. In regards to misrepresentation and fraud, the jury held the will to be invalid. Again, there was undisputed testimony in regard to unauthorized changes to the will made by Boolos. There was also undisputed testimony establishing that Mrs. Dabney was under the assumption that Boolos had copied her old will and had only changed the provisions regarding Freddie. In the case sub judice, judgment notwithstanding the verdict or a new trial would have been improper because there was not overwhelming evidence contrary to the jury's findings. In fact, based on the trial testimony, there was sufficient evidence to establish undue influence, fraud in the execution of a will, and misrepresentation.

¶31. The trial judge was correct in denying the proponents' motion for JNOV or a new trial. There was sufficient evidence for the jury to make its determination and the 12-0 verdict in favor of the contestant was supported. An appellate court may only reverse a jury verdict when the facts considered in that light point so overwhelmingly to the

appellant's position that reasonable men could not have arrived at a contrary verdict. *Wilmoth*, 544 So.2d at 1386.

## CONCLUSION

¶32. David Dabney and Leo Boolos established and maintained a close confidential relationship with Mrs. Eloise Dabney. A confidential relationship raises a presumption of undue influence that must be overcome by the Proponents. The factors for overcoming this presumption were not satisfied at trial; therefore, the evidence was sufficient to support the jury's finding that undue influence was present in this case.

¶33. Boolos drafted a will upon request of the testatrix. She told Boolos to copy the old will, but to exclude the provisions that pertained to Freddie Hataway. Contrary to that request, Boolos also added provisions and made several other changes to the will without permission from Mrs. Dabney. When Mrs. Dabney was presented with the will, testimony showed that Mrs. Dabney was under the impression that the wills were the same, with the exception of the exclusion of Freddie as a beneficiary. This constituted fraud in the execution of a will.

¶34. The jury was justified in its 12-0 verdict which concluded the 1996 will was a product of undue influence, fraud, and misrepresentation. Therefore, the will was correctly held invalid, and the judgment of the lower court is affirmed.

¶35. **JUDGMENT AFFIRMED.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS, MILLS, WALLER AND COBB, JJ., CONCUR. PRATHER, C.J., AND McRAE, J., CONCUR IN RESULT ONLY.**

1. As mentioned earlier, Boolos was engaging in the practice of law without a license in violation of Miss. Code Ann. § 73-3-55 (1995), and was, therefore, not competent to prepare the will.

2. At some point, Fred Dabney Hataway changed his surname to "Dabney."