986 So.2d 987 (2007)
Geraldine CREWS, Appellant
v.
Lisa MAHAFFEY, Appellee.
No. 2006-CP-00856-COA.
Court of Appeals of Mississippi.
December 11, 2007.
Rehearing Denied April 29, 2008.
*989 Geraldine Crews, Appellant, pro se.
Patrick M. Tatum, Ridgeland, for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
IRVING, J., for the Court.
¶ 1. Geraldine Crews filed an action in the Hinds County Circuit Court to recover damages for personal injuries that she alleges to have sustained when she was rear-ended by Lisa Mahaffey. A jury found Mahaffey liable and awarded Crews $5,000 in damages. Aggrieved, Crews appeals, pro se, and alleges that the trial court erred by refusing to grant her motion for an additur or for a new trial.[1]
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. On March 3, 2000, Mahaffey hit Crews's vehicle from behind while Crews was stopped in front of Mahaffey's vehicle at the intersection of Ridgewood Road and Old Canton Road in Jackson, Mississippi. At trial, Crews testified that the impact was so forceful that it caused an "incredible jolt." By contrast, Danny Petty, a witness to the accident, testified that Mahaffey merely "rolled" into the back of Crews. Specifically, he stated that "I've probably been bumped into harder in the line at the grocery store. . . ."
¶ 4. Although there was no visible damage to Crews's vehicle, the impact caused Crews to strike her head against some portion of the interior of her vehicle.[2] An ambulance arrived at the scene and Crews was taken to St. Dominic Hospital where she was treated for head, back, and neck pain. X-rays and a CT scan taken of Crews's head revealed no abnormalities. Nevertheless, the emergency room report indicated that Crews had suffered a hematoma to her head. In the weeks following the accident, Crews saw several doctors for complaints of migraine headaches and neck and lower back pain.
¶ 5. On April 20, 2000, approximately six weeks after the accident with Mahaffey, Crews was involved in a second motor vehicle accident. Crews's vehicle was struck by another vehicle as she exited a parking lot. Crews acknowledged that she was at fault, but claimed that she had to pull her car about six to eight inches in the oncoming lane of traffic because her view was obstructed by bushes, and because she could not properly turn her neck as a result of the first accident. According to Crews, she did not suffer any new injuries as a result of this accident, but she complained that her neck was "slightly more tender." Crews continued to see several doctors for pain that she claimed presented itself after the first accident. Crews testified that prior to March 3, 2000, she had not had any problems with her head or neck. However, on cross-examination, Mahaffey's attorney directed her attention to a 1997 medical report from St. Dominic which indicated that she had complained of neck and left shoulder pain three years before the first accident. Crews testified that she had gone to an MEA medical *990 clinic complaining of chest pain and that, for reasons she could not explain, x-rays were taken of her neck. Crews was adamant that she did not go to St. Dominic at that time and theorized that the doctor at the clinic must have sent the x-rays to St. Dominic. Additionally, Crews denied telling the doctor at the clinic that she had neck and shoulder pain, even though the medical report indicates otherwise.[3]
¶ 6. On September 28, 2001, Crews was involved in a third accident when she collided with another vehicle after failing to stop at an intersection. Crews claims that she did not stop because the stop sign had been removed. Despite totaling her vehicle, Crews did not go to the hospital following this accident. However, she did see a doctor on October 9th pursuant to a previously scheduled doctor's appointment. Crews testified that she informed her doctor that she had been in a third accident and that she suffered from increased headaches and neck pain as a result of the latest accident. In the months and years that followed, Crews saw a host of doctors who prescribed numerous medications and pain management treatments.
¶ 7. Additional facts, as necessary, will be related during our discussion and analysis of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Motion for Additur
¶ 8. We begin our analysis with a discussion of the expert testimony which, in our view, supports the jury's finding of liability against Mahaffey and the jury's award of $5,000. We conclude the discussion with an explanation of why we think the trial judge properly denied Crews's motion for an additur or, alternatively, for a new trial.
¶ 9. Crews offered three experts, who testified by deposition: Dr. E. Greg Wood, an expert in the field of orthopedic and spine surgery; Dr. Larry J. Parker, a neurologist with a subspecialty in neuro-ophthalmology; and Dr. Carroll McLeod, an anesthesiologist and pain management specialist. Mahaffey offered Dr. Moses Jones, an expert in the field of neurosurgery, who also testified by deposition.
¶ 10. Crews was referred to Dr. Wood by Dr. Mack Addison. Dr. Wood initially saw Crews on March 31, 2000. Dr. Wood testified that Crews informed him that she had recently been in a car accident and as a result had been experiencing neck, sternal, left leg, and upper and lower back pain. Dr. Wood stated that Crews attributed all of her complaints to the accident. After reviewing an MRI that Crews had brought with her, Dr. Wood concluded that she had a small left protrusion in her neck at the C-5, C-6, and a small right protrusion at the C-6, C-7. He also noted that the MRI showed a central disc extrusion at the L-5/S-1. Dr. Wood further testified that he could not say whether the disc extrusion was present prior to the first accident; however, he was certain that the disc extrusion could contribute to the pain that Crews was experiencing. Despite his conclusion, Dr. Wood's notes from March 31 indicate that Crews had "full range of motion in her neck."
¶ 11. Dr. Wood saw Crews again on June 12, 2000, at which time he reviewed an MRI that Crews had after the second accident.[4] Dr. Wood concluded that "there *991 was no significant change in her complaints, exam, or [the] MRI of her neck." Dr. Wood's final diagnosis of Crews was that she suffered from cervical spondylolysis or lumbar spondylolysis secondary to her degenerative process.[5] Dr. Wood was asked to explain how the first accident contributed to Crews's degenerative process. He responded, "I don't think it contributed to the degenerative findings that we see on the studies. I think it, based upon her history, contributed or precipitated her symptoms."
¶ 12. On cross-examination, Dr. Wood testified that an x-ray taken the day of the first accident showed that Crews had disc space narrowing at the C-7/T-1, as well as anterior and posterior bone spurs, which he concluded were likely in existence before the first accident. Dr. Wood also stated that Crews told him that she had a history of migraine headaches; however, he stated that she did not mention any history of neck problems. Mahaffey's attorney asked Dr. Wood whether he had an opinion as to whether the second accident aggravated her condition. He responded, "Uh  I assumed when I saw her  uh  that the symptoms she complained about were related to the first, because I don't recall any specific discussions uh whether she improved or was worse or whatever, related to the second accident."[6]
¶ 13. During further examination, Crews's attorney showed Dr. Wood a copy of the x-ray taken in 1997. Dr. Wood testified that although he had not previously seen the report, it did not change his opinion as to Crews's diagnosis on March 31. Further, Dr. Wood stated, "I really can't say with any certainty either that it would have changed me attributing her complaints to the first accident, because those complaints, that, me attributing those symptoms to the first accident is based on her history, not on the MRI that I saw."
¶ 14. Crews saw Dr. Parker on May 23, 2000, after she was referred by Drs. Art Leis and Addison. Dr. Parker testified that Crews informed him that she had been involved in two motor vehicle accidents. Crews's primary complaint was that she suffered from pain in the frontal and temporal region of her forehead that radiated down into the left side of her neck. Crews also complained of recurring headaches, including some that Dr. Parker considered to be migraines.[7] Dr. Parker treated Crews for chronic recurrent pain. When asked whether he knew which of her complaints stemmed from the first accident, Dr. Parker responded:
I think there are things that you can say about this with a degree of reasonable medical certainty and things that are impossible to say which accident caused which. The things that I can say with medical certainty are that complaints that she developed at the time of the first accident, the chronic pain from the headaches, neck pain, shoulder pain, although they had improved before she got [into] her second accident [they] had not gone away, and those things relate back to the first accident. It's equally *992 true that these symptoms were worsened or aggravated by the second accident.
Dr. Parker was also asked whether he could testify to what percent of his treatment related to the first accident. Dr. Parker responded:
I honestly cannot give a percent treatment, and I don't think I could do that with anybody I see who's had multiple problems. The only thing, I can understand both sides of this coin. One side would like to say everything is due to the first accident, and another would like to say nothing is due to the first accident, and both are wrong. It is very clear to me that she did not have a pattern of complaining of these chronic pain problems before the first accident, and so they were initiated and generated clearly by the first accident. Also, since then she has had multiple other accidents and problems that have exacerbated the problem, and so both sides, I think, are true in the sense that clearly she began this difficulty with the first accident. And I don't think anybody can reasonably say the first accident was not a cause of this because that's when the problems began. As to what percent, the good Lord above can say that, but I don't think I can reasonably say that from any logical [sic] or formula that I know of.
¶ 15. Dr. Parker read into evidence excerpts from a letter that Dr. Leis wrote to Dr. Addison on April 6, 2000. In the letter, Dr. Leis concluded that Crews suffered from post-concussion syndrome. Dr. Leis also concluded that the weight loss, rapid heartbeat, and increased sweating that Crews complained of likely was related to the post-concussion syndrome. Further, Dr. Leis concluded that Crews had left facial and headache pain related to the first accident.
¶ 16. Dr. Parker opined that Crews had significant symptoms prior to and after the first accident, and he testified that after the second accident Crews continued to suffer from the same group of complaints. On June 29, 2000, Dr. Parker noted that Crews had improved but that she "still suffered from neck pain and muscle spasms off and on down the spine and in the neck and scalp." He also noted that muscle relaxers and anti-inflammatories seemed to help control the pain.
¶ 17. According to Dr. Parker, migraine headaches are hereditary and can be triggered by a variety of things. Although Dr. Parker recognized Crews's prior migraine history, he also opined that trauma can trigger migraines. He noted that the frequency of Crews's migraines increased after the first accident. Dr. Parker concluded that Crews's problems began with the first accident and were exacerbated by a variety of other things, including the second accident. Dr. Parker wrote a letter to Dr. Leis and Dr. Addison on May 23, 2000, in which he stated:
The pain problem in the neck and head became much worse after [the second accident]. . . . Since then, she has developed a host of other symptoms, some of which relate to the side effects of medications and some of which relate to developing a chronic pain syndrome or a chronic post traumatic stress syndrome.. . . If she stoops over, she does have a sharp pain from the midline in the back radiating into the left leg. She has developed all of these symptoms and relates all of them to the two accidents that she had.

(emphasis added).
¶ 18. Dr. Parker agreed with Dr. Wood that the MRIs indicate that Crews had some bulging in her neck: "As per my first deposition the MRI's [sic] show evidence of bulging disc and arthritic changes *993 which are degenerative changes, and those things are clearly exacerbated and made worse by trauma."[8] Dr. Parker also agreed with Dr. Wood that the arthritic spurs would have been present prior to the first accident because bone spurs take months or even years to develop. However, Dr. Parker stated that he did not know whether the bulging disc was present prior to the accident: "disc bulging can occur acutely after an accident, and it can also occur with degenerative changes that happen over years." He further opined that he did not think the pain that Crews was experiencing related one hundred percent to the disc bulging. He testified that the only objective finding which would account for some of Crews's pain was the intermittent muscle spasm that she experienced mostly in her neck and shoulders. According to Dr. Parker, even though Crews's MRIs did not reveal a problem which would require surgery to repair, it was still possible for her to suffer from chronic pain as a result of other factors. He also commented that the minor nature of the first accident "would be less important to me than her actual complaints."
¶ 19. On cross-examination, Dr. Parker testified, as he had done on direct, that the muscle spasm is the only objective finding which explains the pain that Crews was experiencing in her head and neck. He admitted that the muscle spasm would not explain Crews's complaints of pain in her back that radiated down into her legs. He opined that it was the disc bulging that was likely causing that pain. Dr. Parker noted that the bulges got worse from March 2000 to April 2002. He opined that there are several possible explanations: the second and third accidents, wear and tear, time, and weight. Mahaffey's attorney pointed out that Crews did not mention to Dr. Parker that she had had complaints of neck and shoulder pain in 1997. When asked whether knowing this information would change his opinion, he stated: "It would only change my opinion if she had at that point documented medical records showing over and over again [that] she was coming in with chronic pain in the neck and shoulder rather than a one-time thing."
¶ 20. Mahaffey's attorney presented a series of events that occurred after the first accident: (1) Crews had been involved in two additional motor vehicle accidents, (2) Crews had experienced increased pain after she had flown to Chicago, Illinois, (3) Crews experienced increased pain after she played with her puppy, and (4) Crews was hospitalized in April 2002 after feeling a "pop" in her back shortly after she completed yard work. Dr. Parker testified that it was possible that Crews would still be experiencing pain due to the events outlined above, even had the first accident not occurred.
¶ 21. Crews saw Dr. McLeod for the first time on June 14, 2000. She had been referred to him by Dr. Parker for an evaluation of the neck, right arm, and the lower back pain that she was experiencing. Dr. McLeod testified about the disc protrusions and the disc extrusion which were present on the first MRI. Dr. McLeod noted that Crews had "full range of motion" of her neck. He opined that Crews's complaints were consistent with her MRI. Dr. McLeod's initial impression was that Crews suffered from pain in her neck and right shoulder, but he noted that the right shoulder pain was secondary to the pain that she suffered as a result of the C-6, C-7 disc protrusions. Additionally, Dr. *994 McLeod concluded that Crews suffered from lower back pain and myofascial pain, which he defined as trigger points in the muscle spasms in the lower back.
¶ 22. In the months that followed Crews's initial visit to Dr. McLeod, she underwent a series of epidural steroid injections in her neck at the C-7/T-1, as well as in her upper back. Dr. McLeod testified that Crews suffered from degenerative disc disease and stated that he "would be willing to bet" that some of the degenerative disc disease was present before the first accident. As far as long-term projections, Dr. McLeod opined: "I think she will continue to have problems to recur at different times. She's not going to heal the degenerative changes . . . the disc protrusions are going to continue to be present. And I would expect over the long haul for her condition to deteriorate, not improve." Dr. McLeod further opined, "She may have periods of time that she has very little pain, but I don't think she will be pain free over the rest of her life." Dr. McLeod insisted that he had no reason to suspect that Crews was exaggerating, faking, or lying about her symptoms. He also testified that it is not uncommon for people who suffer from degenerative disc disease to make complaints of this nature following a minor vehicle accident. Dr. McLeod attributed Crews's complaints to the first accident because, according to his records, she had no prior history of neck or back complaints and because her MRI showed disc protrusions in areas that correlated with her complaints.
¶ 23. On cross-examination, Mahaffey's attorney pointed out that Dr. McLeod did not know whether Crews had made any improvements prior to the second accident. Dr. McLeod acknowledged that Crews had failed to inform him that she had experienced pain in her neck and shoulder in 1997. Dr. McLeod also agreed with Dr. Wood that the spondylolysis that was present on Crews's CT scan existed prior to the first accident, and he opined that Crews may have been asymptomatic until the accident. Dr. McLeod also noted that plain films taken of Crews's lumbar spine the day after the first accident showed some scoliosis[9] to the left at about the L-3, L-4.
¶ 24. Dr. McLeod compared the cervical findings in the x-rays taken after the first accident to the cervical findings in the 1997 x-rays. He testified that in 1997 the narrowing was minimal and that the cervical spine changes were unremarkable. However, according to Dr. McLeod, on March 4, 2000, the cervical spine changes had degenerated more. Mahaffey's attorney pointed out that there is no way to know if Crews had any disc protrusions prior to March 3, 2000:
Q. Since we don't have a prior MRI study, prior to March 3 of 2000, we don't know if these disc protrusions were present prior to the accident of March 3, 2000, do we?
A. No, sir.
Q. And these conditions that she had as indicated by these MRI studies, could have been present prior to the accident?
A. Very possibly, they could have been present, or they could, also equally as likely, developed at the time of the accident.
¶ 25. It is important to note that in 1997 Crews complained of pain in her neck and left arm, but when she saw Dr. McLeod in June 2000, she complained of *995 pain in her neck and right arm. However, shortly thereafter, she made no further complaints of right arm pain and only complained of left arm pain. The following exchange occurred when Mahaffey's attorney asked Dr. McLeod about Crews's complaints in 1997 and about her complaints following the first two accidents:
Q. Let's go ahead and jump to the first date you saw Ms. Crews on June 14 of 2000. I believe you mentioned that she was having neck problems and problems with her right arm and low back pain; correct?
A. That's correct.
Q. I also see where you note that her most significant problem was the upper neck and shoulder?
A. That's correct.
Q. Now, the upper neck and shoulder, those were similar problems that she was having back in 1997, at least by the record you have in 1997; correct?
A. Well, they were different in that that one said left arm in '97, and neck, this one was neck and right arm or her first visit, so, no. Her neck and left shoulder, I believe, they referred to, and this says neck and right arm, is what I dictated.
Q. And on this visit, she had full range of motion of her neck; correct?
A. That's correct.
Q. Now, the next visit you had with Ms. Crews on June 28 of 2000, the pain in the right shoulder or the right arm went away, and it had jumped to the left arm, left shoulder?
A. That's correct. Well, it didn't go away, but it was worse on the left than the right.
Q. Do you mention, anywhere in this report, that she was still having problems with her right arm or right shoulder?
A. No. I did not, didn't comment one way or the other.
* * * *
Q. Now, did she have any right shoulder or right arm pain in July of 2000?
A. No, I didn't document any. I don't think she was complaining of right arm pain.
Q. So, the pain she was having was left arm pain or left shoulder pain?
A. That's correct.
Q. And again, on the next visit, August 2 of 2000, was there any mention of right arm pain during that visit?
A. No, sir, just left arm at that time.
¶ 26. We now turn to Mahaffey's expert witness, Dr. Jones, who testified that he did not see any objective evidence in Crews's medical records to suggest that she suffered from an acute abnormality. As such, he opined that Crews's problems related to her degenerative disc disease. Dr. Jones also testified that he does not believe that any of the treatment that Crews received following the second accident was directly related to the first accident.
¶ 27. Like Dr. Wood and Dr. McLeod, Dr. Jones testified that the spondylolysis was not caused by the first accident. Dr. Jones also testified that Crews had some scoliosis and bone spurring. He noted that Crews's disc protrusions relate to the degenerative changes at the C-5, C-6, and C-7. He also reviewed the MRI that was taken after the second accident and concluded that the disc extrusion at the L-5/S-1 "almost certainly" predated the first accident. Additionally, Dr. Jones noted that the X-rays taken in 1997 indicate problems at the C-5, C-6, C-7.
*996 ¶ 28. Mahaffey's attorney asked Dr. Jones about results from a physical examination performed by Dr. Robert A. McGuire on April 7, 2000. Dr. Jones read from Dr. McGuire's notes where Dr. McGuire, like Dr. Wood and Dr. McLeod, concluded that Crews had "full range motion of her cervical spine." Mahaffey's attorney asked Dr. Jones, "by [April 7, 2000] had Ms. Crews started to get better or started to recover from the accident with my client on March 3rd of 2000?" Dr. Jones replied, "Well, I can't say she has gotten any better because we haven't demonstrated that we have anything abnormal in the first place."
¶ 29. Dr. Jones noted that Crews's complaints became more severe after the second accident. He relied on statements made by Dr. Parker in a letter written to Drs. Leis and Addison. In the letter, Dr. Parker states that "[Crews] was beginning to feel better . . . then [she] had a second accident." Further, Dr. Parker stated that "the pain problem in the neck and head became much worse after this." Additionally, Dr. Parker noted that "[s]ince then, she has developed a host of other symptoms, some of which relate to the side effects of medications and some of which relate to developing a chronic pain syndrome or a chronic post traumatic stress syndrome."
¶ 30. Mahaffey's attorney also pointed out that Dr. McGuire's notes from April 7, 2000, do not indicate that Crews complained of pain radiating in her arms and down into her legs. Furthermore, Dr. Jones testified that his review of Crews's medical records revealed that she did not complain of pain radiating in her arms and down into her legs until after the second accident.
¶ 31. Dr. Jones read into evidence a medical record from Dr. William Geissler, whom Crews went to see on June 28, 2000. Dr. Geissler noted that "Ms. Crews comes in today primarily for an evaluation regarding her right lower leg. She has been involved in two motor vehicle accidents. She relates that after the second motor vehicle accident, she developed pain in her right lower leg." Dr. Jones testified that he found it significant that Crews began making complaints of right lower leg pain after the second accident and not before.
¶ 32. Dr. Jones, like Dr. Parker, related the treatment that Crews received after suffering the "pop" while she was doing yard work, to injuries associated with the "pop" and not to injuries from the first accident.[10] Dr. Jones also concluded that the increased headaches and neck pain that Crews experienced following her third motor vehicle accident did not relate to the first accident.
¶ 33. On cross-examination, Dr. Jones noted that his testimony was based on his review of Crews's medical records and not from a physical examination. Dr. Jones opined that migraines do not arise from head trauma, but rather are a specific type of headache. As previously stated, he testified that the protrusions at the C-5, C-6, and C-7 were not caused by the first accident; however, he admitted that the protrusions could have been aggravated by the accident. Dr. Jones disagreed with Dr. Addison's finding that Crews suffered from a cervical injury following the first accident. Dr. Jones notes that Dr. Addison's findings were based on Crews's subjective complaints and not on an MRI, as the first MRI was not taken until March 21, 2000. Dr. Jones agreed that Crews *997 suffered from subjective complaints of pain after the first accident. However, he asserted that some of the doctors had associated the complaints with the first accident while others had not.
¶ 34. Crews's attorney pointed out that she received a series of epidural injections from Dr. McLeod, and asked Dr. Jones whether he had an opinion as to whether the treatment was related to the first accident. Dr. Jones stated that Dr. McLeod's treatment was more related to the second accident than to the first because the injections were given after Crews had seen Dr. Parker, who noted that she had shown signs of improvement prior to the second accident.
¶ 35. Now that we have discussed the expert testimony, we turn to Crews's contention that the trial judge erred in refusing to grant an additur to supplement the jury's finding on damages.
¶ 36. An additur will only be granted in cases where the trial judge makes a finding that the damage award was inadequate because the jury was "influenced by bias, prejudice or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence." Miss.Code Ann. § 11-1-53 (Rev.2002). We determine whether a jury award is excessive on a case-by-case basis. Purdon v. Locke, 807 So.2d 373, 376(¶ 9) (Miss.2001) (citing Biloxi Elec. Co. v. Thorn, 264 So.2d 404, 405 (Miss.1972)). "The party seeking the additur bears the burden of proving his injuries, loss of income, and other damages." Patterson v. Liberty Assocs., L.P., 910 So.2d 1014, 1020(¶ 19) (Miss.2004) (quoting Maddox v. Muirhead, 738 So.2d 742, 743-44(¶ 5) (Miss.1999)). "We view the evidence in the light most favorable to the defendant, giving him all favorable inferences that may be reasonably drawn therefrom." Id. Our review of a trial court's denial of an additur is limited to an abuse of discretion standard. Maddox, 738 So.2d at 743(¶ 5) (citing Rodgers v. Pascagoula Pub. Sch. Dist., 611 So.2d 942, 945).
¶ 37. We are presented with a classic case of the battle of the experts, as Crews's experts contend that her complaints relate to, or were aggravated by, the first accident, while Mahaffey's expert contends that Crews's problems relate to her degenerative disc disease. The jury considered the expert testimony offered by Crews and Mahaffey and found Mahaffey liable for hitting Crews from behind, and assessed Crews's damages at $5,000.
¶ 38. Although Mahaffey's expert differs with Crews's experts as to the cause of Crews's problems for which she is seeking damages, apparently the jury found Crews's experts at least somewhat credible, as they awarded her $5,000. "[W]hen the evidence is conflicting or contradictory, [an appellate court] will defer to the jury's determination of the credibility of the witnesses and the weight and worth of their testimony." Sessums v. Northtown Limousines, 664 So.2d 164, 168 (Miss.1995) (citing Odom v. Roberts, 606 So.2d 114, 118 (Miss.1992)). We cannot "set aside a verdict unless it is clear that the verdict is a result of prejudice, bias or fraud, or is manifestly against the weight of the credible evidence." Id. (quoting Wilmoth v. Peaster Tractor Co. of Lexington, Inc., 544 So.2d 1384, 1386-87 (Miss. 1989)). Therefore, a jury's verdict cannot be reversed simply because it found one expert more believable than another. Id. at 169.
¶ 39. There is nothing in the record which suggests that the jury was influenced by prejudice, bias, or passion. Furthermore, we cannot say that the trial judge abused his discretion, as there was sufficient evidence from which the jury *998 and the trial judge could have found that Crews was only entitled to $5,000 in damages, even though she presented evidence that she incurred $41,941.27 in medical bills. We find no merit to this issue.

2. Motion for New Trial
¶ 40. "The motion for a new trial has only been employed in `rare cases when there would be injustice either in allowing the verdict to stand or in granting a j.n.o.v.'" Fiddle, Inc. v. Shannon, 834 So.2d 39, 45(¶ 25) (Miss.2003) (quoting C & C Trucking Co., 612 So.2d 1092, 1099 (Miss.1992)). Pursuant to Rule 59 of the Mississippi Rules of Civil Procedure, a trial judge may grant a new trial when justice so requires. "A new trial may be granted `when the verdict is against the overwhelming weight of the evidence, or when the jury has been confused by faulty jury instructions, or when the jury has departed from its oath and its verdict is a result from bias, passion, and prejudice.'" Id. (quoting Bobby Kitchens, Inc. v. Miss. Ins. Guar. Ass'n, 560 So.2d 129, 132 (Miss. 1989)). As with an additur, we review a trial judge's denial of a request for a new trial under an abuse of discretion standard. Id. (citing Bobby Kitchens, Inc., 560 So.2d at 132).
¶ 41. As previously stated, Crews contends that the damages awarded by the jury were inadequate, as she has incurred $41,941.27 in medical bills. We have already concluded that the jury's award does not evince bias, prejudice, or passion. Additionally, we find that the jury's damages award was proper, and was not manifestly against the overwhelming weight of the credible evidence. We note that the jury's award is not improper simply because the jury did not believe that Crews sustained over $40,000 in damages as a result of her accident with Mahaffey. The jury considered expert testimony from both sides prior to rendering its decision. In addition to the expert testimony, the jury considered the testimony of Mahaffey and Petty, who testified as to the minor nature of the accident. The uncontradicted evidence indicated that neither vehicle suffered significant damage. Specifically, the ambulance report stated that there was no visible damage to Crews's vehicle. The jury was entitled to believe whomever it found the most credible, and in light of the evidence presented, we cannot conclude that the jury's decision is against the overwhelming weight of the evidence. This issue is without merit.
¶ 42. Crews also contends that the trial court erred in refusing to give jury instruction number one, and in giving instruction number five.[11] Jury instruction number one is a peremptory instruction which reads: "The Court instructs you to find for the Plaintiff, Geraldine Crews, and to assess her damages, if any, in accordance with the other instructions of the Court."
¶ 43. Mahaffey admitted hitting Crews from behind while Crews was lawfully stopped. Clearly, Mahaffey was guilty of failing to maintain a proper lookout, and was therefore negligent. Consequently, it appears to us that there was an evidentiary basis for granting Crews's peremptory instruction on the issue of liability. "A party has the right to have his theory of the case presented to the jury by instructions, if there is evidence to support *999 it." Alley v. Praschak Mach. Co., 366 So.2d 661, 665 (Miss.1979) (citing Murphy v. Burney, 27 So.2d 773 (1946)). Even though the trial court erroneously failed to grant the instruction, we find the error harmless because the jury returned a verdict in favor of Crews.
¶ 44. As for Crews's argument that the trial judge erred in allowing jury instruction number five to be presented to the jury, we find that this issue is procedurally barred because Crews failed to object to its introduction at trial. "The trial judge cannot be put in error on a matter which was not presented to him for decision." Id. (citing Cossitt v. Federated Guar. Mut. Ins. Co., 541 So.2d 436, 446 (Miss.1989)). Thus, there is no merit to this issue.
¶ 45. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] We note that Crews asserts three issues for our review. However, we consolidate them into two issues, as one of the three is a subissue.
[2] It is unclear whether her head hit the windshield, the steering wheel, or the dashboard.
[3] In a pretrial deposition, Crews stated that she had not had any prior back pain. However, on cross-examination, she stated that she had experienced lower back pain when she was about twenty-five years old but insisted that she did not have a history of chronic lower back pain.
[4] On cross-examination, Dr. Wood stated that he could not remember whether Crews informed him of her second car accident, and he stated that there is nothing in his notes that indicates that she informed him of such.
[5] Dr. Wood testified that Crews suffered from degenerative changes in her cervical spine.
[6] Based on his prior statement that Crews did not inform him of her second accident, we interpret Dr. Wood's statement to mean that he attributed Crews's symptoms to the first accident because he was unaware of the second accident.
[7] Dr. Parker noted that Crews had a history of migraines prior to the first accident.
[8] Throughout his testimony, Dr. Parker refers to testimony he gave in his "first" deposition; however, we have summarized the only deposition that is contained in our record, the deposition that was admitted into evidence at trial.
[9] Dr. McLeod defined scoliosis as a curvature of the spine. He opined that Crews's scoliosis was a pre-existing condition.
[10] As stated, Crews felt a "pop" in her back in late April 2002. The "pop" occurred sometime after she had finished doing yard work.
[11] Instruction number five reads: "The Court instructs the jury that the word `negligence' as used in these instructions means the doing of some act which a reasonably prudent person would not do under the same or similar circumstances as are present at the time, or the failure to do some act which a reasonably prudent person would do under the same or similar circumstances as are present at the time."