MYERS, J.,
for the Court:
¶ 1. Charles Hubbard sued Delta Sanitation of Mississippi, LLC in the Harrison County Circuit Court for injuries sustained in an automobile accident. A jury returned a verdict in favor of Hubbard for $8,000 in damages. The circuit court awarded costs to Delta in the amount of $7,012.03 based on the court’s finding, under Rule 68 of the Mississippi Rules of Civil Procedure, that the jury’s damage award was less favorable than the settlement offer Delta had proposed to Hubbard prior to trial. Hubbard appeals asserting the following three issues, which we restate for clarity:
I. The trial court erred in failing to impose an additur, pursuant to Mississippi Code section 11-1-55, as the jury verdict in the amount of $8,000 was contrary to the overwhelming weight of the evidence.
II. The trial court erred in a pretrial ruling which denied Hubbard the fundamental right to present medical evidence of his prior neurological condition (multiple sclerosis), thus, denying Hubbard a fair and impartial trial.
III. Delta was not entitled to $7,012.03 in costs under Rule 68.
¶ 2. We affirm the trial court’s judgment on issues one and two. We reverse, however, on issue three.
FACTS
¶ 3. On December 1, 2006, Hubbard’s Dodge Ram pickup truck was hit from behind by a Mack truck, owned by Delta. The accident occurred while Hubbard was sitting in the turning lane at the intersection of Highway 90 and Lorraine Road in Gulfport, Mississippi. According to Hubbard, the impact pushed his truck beyond the white line where his truck was stopped for a distance of approximately the length of his vehicle. Hubbard said that during the impact he felt his body being pushed forward and then back against the driver’s seat. Immediately following the accident, Hubbard spoke with Delta’s driver, who Hubbard said told him that he was not able to stop his truck in time.
¶ 4. Hubbard described Delta’s truck as a larger size dump truck, which was loaded with concrete slabs. Hubbard described his Dodge as a “heavy-duty pickup truck” which sits on a “heavy-duty frame” and is fitted with a “heavy-duty bumper.” Photographs of Hubbard’s bumper introduced into evidence showed indentations on the Dodge’s bumper, which Hubbard said were from the bolts on the Mack truck’s bumper.
¶ 5. Hubbard, a senior chemist with the Southern Company, remained at the scene of the accident for approximately twenty minutes. He spoke to Officer Kevin Jackson, of the Gulfport Police Department, who wrote the accident report, and he then drove to an area plant where he was working for Southern Company. Hubbard testified that when he arrived at the plant, he was still suffering a dull ache in his neck and back. Hubbard said the pain did not get worse until the next two to three days, at which time he began experiencing a linear progression of pain in both areas.
¶ 6. Hubbard saw his general physician, Dr. Paul Matherne, on December 22, 2006. He recalled telling Dr. Matherne that his neck was bothering him as well as his lower back. Dr. Matherne ordered x-rays *550 taken and then recommended that Hubbard be evaluated by orthopedic surgeon, Dr. Eric Graham.
¶ 7. According to Hubbard, by the time he first saw Dr. Graham in February 2007, the pain in his neck and back had progressed and was getting worse each day. Hubbard described the pain as radiating from his neck down through his arms and into his hands. Hubbard testified that as he continued under Dr. Graham’s care he began losing strength in his arms, and it was then that Dr. Graham recommended cervical surgery. Hubbard underwent surgery in April 2008. Hubbard testified that in the calendar year 2006, prior to the date of the accident, he never had any radicular pain or weakness and had no similar symptoms of that sort prior to the December 1 accident.
¶ 8. Hubbard testified that the total medical bills incurred from the surgery performed by Dr. Graham and the related treatment he had leading up to and after his surgery was $138,294.15. He testified that he also had out-of-pocket expenses for mileage of $168.18, and he incurred loss wages as a result of his injury and subsequent surgery in the amount of $14,074.48. The cost to have his truck repaired, which consisted of using after-market parts, totaled $645.21.
¶ 9. In addition to Hubbard’s testimony, the jury heard from Hubbard’s wife, Denise Hubbard, and from Dr. Graham, via a video deposition taken of Dr. Graham prior to trial. Denise testified to the effects the alleged injuries had on Hubbard’s lifestyle. Dr. Graham testified to the treatment he provided Hubbard.
¶ 10. Dr. Graham stated that he first began treating Hubbard in July 2004 when Hubbard was sent to him by a colleague for evaluation of Hubbard’s back and legs. At that time, Dr. Graham diagnosed Hubbard with “L 4-5 spondylolisthesis,” which basically means an “unstable segment” in the lower back. Dr. Graham explained that spondylolisthesis is a degenerative condition created by arthritis, in which “the spine begins to slip off itself.” As a result of this condition, nerve roots tend to get pinched between the bone and the disc as it slides forward. Dr. Graham testified that he prescribed physical therapy and a trial of epidurals — treatment which Hubbard had carried out for several years.
¶ 11. Dr. Graham said Hubbard did not return to his office until February 2007. At that time, Hubbard told him that he had been hit from behind by a dump truck, and he complained of worsening back and leg pain as well as neck and arm pain. Dr. Graham said that Dr. Matherne had previously put Hubbard through physical therapy following the December 2006 accident, which failed to give Hubbard relief. Dr. Graham also testified that when he saw Hubbard in 2004, there were no complaints of neck pain.
¶ 12. According to Dr. Graham, Hubbard perfectly described the symptoms of “radiculopathy” in his neck and in his left arm. Dr. Graham explained that radiculo-pathy was a pain that travels down the arm in a certain fashion that “follows a dermatome,” and in this case it was “following the C-6 dermatome.” Dr. Graham saw Hubbard again in March 2007, at which time Hubbard had an MRI done. The MRI showed “a left sided disc complex at C4-5 and C5-6.” Dr. Graham said that Hubbard had a herniation of those discs that were impinging upon the nerves in Hubbard’s spinal canal and that this was causing the pain sensation or radiation into Hubbard’s upper extremities.
¶ 13. Dr. Graham discussed conservative treatment measures with Hubbard, which included continuing the epidurals. Because Hubbard had also recently been *551 diagnosed with an unrelated neurological disorder,[1] Dr. Graham advised Hubbard that he would need to clear surgery with Dr. Terry Millette, Hubbard’s neurologist.
¶ 14. Dr. Graham did not hear from Hubbard again until March 2008, when Hubbard began experiencing motor deficits resulting in “weakness to wrist extension and bicep function.” Dr. Graham explained to Hubbard that cervical and lumbar surgeries offer some chances for improvement. Dr. Graham indicated that he recommended cervical surgery in Hubbard’s case because of the weakness Hubbard was experiencing and because the longer one lives with pressure sitting on the motor nerve, the more likely it is to become a permanent fixture.
¶ 15. Dr. Graham consulted with Dr. Millette, who said that surgery was neurologically acceptable for Hubbard. Dr. Graham then performed a two-level “anterior cervical discectomy and fusion at C-4 and C-5.” Dr. Graham testified that following surgery, Hubbard was ninety-five percent better than before the procedure, and after additional physical therapy and other conservative measures, he placed Hubbard at maximum medical improvement by October 2008. Dr. Graham added that based on the American Medical Association’s guidelines of permanent impairment, Hubbard had a category-four impairment, which he said results anytime you “resort to a fusion.” He said that because there were two levels involved in the procedure, Hubbard had a twenty-six percent permanent impairment to the body as a whole.
¶ 16. Dr. Graham testified that he believed, based upon a reasonable degree of medical probability, the December 2006 accident was a contributing cause for Hubbard’s neck injury (herniated disc) and resulting surgery.
¶ 17. Delta presented two witnesses in its case-in-chief, Lloyd David Walker, the driver of the Mack truck, and Dr. Lennon Bowen, a neurologist, retained by Delta to review Hubbard’s medical records.
¶ 18. Walker testified that prior to the accident, he and Hubbard were both in the turning lane at the Lorraine Road/Highway 90 intersection. The traffic light at the intersection had turned solid green, not a protected arrow green, so both vehicles proceeded forward. Walker said that Hubbard stopped his vehicle and that he, Walker, was unable to stop quick enough, and he rear-ended Hubbard’s vehicle. Walker said his vehicle struck Hubbard’s vehicle at approximately five miles per hour. Walker remembered seeing a dent in Hubbard’s bumper following the accident and that it looked as if a bolt, which holds a “cowcatcher-type bumper” onto Delta’s truck, had hit Hubbard’s bumper and made an indentation. Walker described Delta’s vehicle as a 2006 Mack truck, which had a “roll-off 20-yard container” located on the bed of the tractor which weighed approximately 24,000 to 26,000 pounds.
¶ 19. Dr. Bowen testified that in his opinion, Hubbard’s alleged injuries in the case pre-existed the December 2006 accident. Based upon Dr. Bowen’s review of Hubbard’s medical records and imaging records, Hubbard had been suffering from a slow progressive degenerative condition in his spine for several years. He said Hubbard’s imagining records were fairly consistent with a normal degenerative process. He noted that Hubbard’s medical records indicated that Hubbard had been complaining of numbness radiating down the left arm for years and that Hubbard had developed some “weakness” prior to *552 the December 1 accident that fit with “C-6 nerve distribution.”
¶20. After the close of evidence, the trial court granted Hubbard a peremptory instruction on negligence and instructed the jury as to causation. The jury awarded Hubbard $3,000 in damages.
¶ 21. Prior to trial, Delta made an offer of judgment, pursuant to Rule 68 of the Mississippi Rules of Civil Procedure, in the amount of $30,000. Delta made the offer more than fifteen days before the date of trial as required by the rule, but Hubbard refused it. Because the jury’s verdict was not more favorable than Delta’s proposed offer, the trial court awarded Delta costs in the amount of $7,012.03. This appeal followed. Additional facts, as necessary, will be related during our discussion of the issues.
DISCUSSION
I. Additur
¶ 22. Hubbard argues that the $3,000 jury award constitutes a miscarriage of justice as it bears no. relevance or resemblance to the damages in this case. He contends that proof of his medical bills, out-of-pocket expenses, and the property damage to his truck, in the total amounts mentioned above, were allowed into evidence without objection from Delta. Accordingly, Hubbard maintains there was prima facie proof that these expenses were necessitated and sustained by him for injuries arising directly from the December 2006 accident; thus, the jury was provided a minimum floor upon which to build its calculation of damages. Hubbard argues that the jury disregarded such proof, and it completely ignored the pain and suffering and permanent injury testified to by Dr. Graham when he assigned a twenty-six percent impairment rating to Hubbard as a result of the surgery. Hubbard further contends that Delta’s expert, Dr. Bowen, never gave any testimony that the surgery performed by Dr. Graham, and the medical bills attendant thereto, were “not” caused by the December 2006 accident.
¶ 23. Pursuant to Mississippi Code Annotated section 11-1-55 (Rev.2002), the trial judge has the authority to grant an additur. The statute states:
The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an addi-tur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted!,] then the court may direct a new trial on damages only. If the addi-tur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
Miss.Code Ann. § 11-1-55.
¶ 24. In reviewing a trial court’s grant or denial of an additur, our standard of review is limited to an abuse of discretion. Rodgers v. Pascagoula Pub. Sch. Dist., 611 So.2d 942, 945 (Miss.1992). “The party seeking the additur bears the burden of proving his [or her] injuries, loss of income, and other damages.” Gaines v. K-Mart Corp., 860 So.2d 1214, 1220 (¶21) (Miss.2003). The evidence is viewed in the light most favorable to the opposing party, “giving [that party] all favorable inferences that may be reasonably drawn therefrom.” Id. An additur should be employed with *553 great caution because it represents an infringement upon the traditional role of the jury as the fact-finder. Gibbs v. Banks, 527 So.2d 658, 659 (Miss.1988).
¶ 25. At the outset, we find no merit to Hubbard’s contention that the sum total of the expenses he introduced into evidence without objection from Delta provided the jury a minimum floor from which to build its calculation of damages.
¶ 26. The Mississippi Supreme Court considered a similar argument in the case of Herring v. Poirrier, 797 So.2d 797, 808-09 (¶ 38) (Miss.2000). There, the plaintiff argued that based on Mississippi Code Annotated section 41-9-119 (Rev.2005),[2] “proof that he incurred medical bills of $21,997.18 is prima facie evidence that the bills were necessary and reasonable”; thus, his “medical bills constituted a minimum floor upon which the jury should have assessed damages.” Id. The supreme court rejected that argument and held that “even if, pursuant to [section] 41-9-119, [the plaintiffs] medical bills were necessary and reasonable, [section] 41-9-119 does not mandate a finding that those medical bills were incurred as a result of the accident in question.” Id. at 809 (¶ 39); see also McCay v. Jones, 354 So.2d 1095, 1101 (Miss.1978) (explaining that the purpose of section 41-9-119 “was to simplify the procedure for proving medical expenses where claimed as an element of damages”) (emphasis added).
¶27. Here, Delta did not contest the necessity and reasonableness of Hubbard’s medical expenses. Rather, Delta challenged Hubbard’s cause of action on the theory that the December 2006 accident — even though caused by its driver’s negligence — was not the cause of the personal injuries Hubbard claimed had resulted.
¶ 28. Delta’s expert, Dr. Bowen, testified that based on Hubbard’s medical records, Hubbard had presented to Dr. Graham complaining of radicular arm pain shortly after the December 2006 accident, and then again a year later. Dr. Bowen said that Dr. Graham eventually recommended surgery because Hubbard’s neck and arm pain were getting worse and because Hubbard was exhibiting clinical weakness in his left arm. Dr. Bowen noted that Dr. Graham had stated in his deposition that these symptoms did not exist before the December 2006 accident; yet Hubbard’s various medical records revealed otherwise. Dr. Bowen then explained why he believed the symptoms that led to Hubbard’s surgery were the result of a degenerative condition of the spine and not the December 2006 accident, stating:
Degenerative changes are this. They can happen, some people are more susceptible than [others,] depending on what you’ve done in your life, genetics, body shape, gravity, or if you’ve had prior injuries or whatever.
But essentially what happens ... is the bones tend to flatten out a little bit with time. When they flatten, it’s almost like if you squish a Moon Pie.... And when we see bones collapsing, they tend to get these little corners on them....
These are real classical things for degenerative things_We have these little spurs on the edges.... And because of this, when they flatten out ... the discs compress in between. And as they compress, it’s just like the marshmallow in a Moon Pie getting kind of squished *554 out [sic] the sides, and it corresponds exactly with the spurs.
So as those spurs push out, they push out the ligament that holds them in place, and these discs correspondingly are following that ligament as it’s pushing out and slip into that area.
That is not something you see typically with acute traumatic injury. Now, this is something if you had an injury years ago, it can start to cascade the degeneration....
So this is a film from April of 2006 prior to [Hubbard’s] accident. Now, this is just one slice. I’ve looked at every slice going each way. We have them all stacked up, but this is just a general idea of what — when we say degenerative changes....
Versus a traumatic injury, we have a normal looking bone typically with a big disc that popped out, not these that correspond nicely with these edges or these points and the disc just slips out right to the edges of those points. With a traumatic injury of acute sudden, boom, disc herniation, these disc will usually go past those.
¶ 29. Dr. Bowen then compared the April 2006 MRI film taken of Hubbard’s neck with MRI film taken in February 2007, explaining:
These are the same two levels with the same spurs, the same discs with the same bulges, and there’s no difference. We’ve looked at those time and time again. You don’t see — and it doesn’t matter which cut you go through there’s no change.
And [Hubbard] has a bad neck. There’s not an issue whether or not he’s got a bad neck or whether or not he needed surgery. It was just this persistent problem with his left arm going on and on. And with these particular changes, it’s fairly obvious that this was something that was already occurring well before getting a ding from the bumper.
¶ 30. The following exchange occurred during Hubbard’s cross-examination of Dr. Bowen:
Q. Okay. You don’t claim to be infallible in any of your opinions, do you, Doctor, you’ve expressed here today?
A. I don’t claim that. If I may, with explaining why I don’t think ... [Hubbard] was injured in that accident is because he wasn’t having but just a little complaining ... [of] neck soreness. Typically if you have a nerve root injury, it’s an acute injury. You are going to be the worst at the time of the accident if it’s a nerve root injury, not a muscular injury, not a ligamentous injury.
But a nerve root, you can’t compress a nerve. I can’t come up and take a hammer and crunch your funny bone nerve, and then you’re worse six months than you were when I crushed your nerve. Typically you’re going to have a decrescendo or you’re going to have a stabilization. I mean, worst of the time of your accident [sic] if you crush a nerve root.
And then over time you either get better or you don’t get much better at all. You don’t go from here and then go into your doctor’s office in February and examine [sic] you and go, oh, you have a normal exam, not show up for a year, then you’ve got weakness, and they say this is clearly from your crushed nerve root. It doesn’t work that way. And that’s why most of the surgeons send people to me to make that decision a lot of times.[3]
*555 Q. So Dr. Graham is totally wrong in this case? Is that what you’re telling us?
A. No. What Dr. Graham said was this [accident] may have exacerbated his degenerative process, which over time may have aggravated this nerve root leading to this weakness a year later. But an acute nerve root injury—
Q. Do you disagree with him on that?
[[Image here]]
A. No. I’m saying what he’s saying. And I’m saying that you can’t crush a nerve and be worse a year from now than you were at the time of the injury, and that’s just the way it is. I mean, that’s just the way it is.
Now, what ... Dr. Graham[’s] ... testimony was, if you accelerate the degenerative process, you get leakage of disc material out on the nerve, these type of things, over a cumulative time over a year, it can aggravate the nerve.
Q. Do you disagree with that?
A. I don’t disagree with that.
Q. And in fact, he said that is the cause of what happened in this case—
A. Well, the problem was—
Q. Wait. Let me finish, Doctor. That is what he testified in this case, and he said that is what caused the need for surgery, and that’s why he felt that this collision was the direct cause of his need for surgery, did he not?
A. Yes, sir.
Q. Did he not?
A. No, sir. Not all the way.
Q. What did he say the cause for surgery was?
A. He also said that the cause of surgery is [Hubbard] had clinical weakness and he also — that before and after, that he had clinical weakness after which he didn’t have, which he did, and he didn’t have this numbness radiating down the arm into the hand, which [Hubbard’s medical record’s] clearly stated he did. And then he said it wasn’t prior, which is on every particular medical record we’ve looked at.
Q. Doctor, let’s be—
A. There’s been a change in his exam is what he said. He said, the reason why I did surgery is because if somebody comes in with a crappy looking MIR [sic] and they’re doing fine, you don’t mess with them. If you have a change in their clinical course and it looks like it’s causing you symptoms, that’s the reason to operate. And the reason why he based his reason that this guy was getting worse after his wreck was he didn’t know that he had these symptoms prior.
Q. Doctor—
A. It’s pretty self-evident.
Q. Did he not testify as [sic] the records of Dr. [Donnis] Harrison and Dr. Millette? Did you not hear—
A. Dr. Harrison, he said, said that he didn’t have any weakness on [the] exam, and it’s documented that he did. So I think he brushed over that. I don’t think he saw it or whatever. But he said he documented a normal exam, and it’s not documented normal. It documented weakness on that exam.
¶ 31. Based on our review of the record, Delta provided sufficient evidence in support of its case from which the jury could reasonably conclude that Hubbard’s personal injuries were not caused by Delta’s negligence. Dr. Graham’s testimony was disputed by Dr. Bowen’s testimony. The weight accorded to differing opinions of experts, is a question of fact for the jury. Daniels v. GNB, Inc., 629 So.2d 595, 602 (Miss.1993) (citing Ford Motor Co. v. Cockrell, 211 So.2d 833, 837 (Miss.1968)). “[A] jury’s verdict cannot be reversed sim *556 ply because it found one expert more believable than another.” Crews v. Mahaffey, 986 So.2d 987, 997 (¶ 38) (Miss.Ct.App.2007) (citation omitted).
¶ 82. We find nothing in the record that suggests Hubbard’s jury was biased or prejudiced in its decision. Nor do we find the jury’s damage award of $3,000 to be contrary to the overwhelming weight of the evidence. The amount of damages to be awarded is primarily for the jury to determine. Harvey v. Wall, 649 So.2d 184, 187 (Miss.1995). There was sufficient evidence presented in this case to support the jury’s award.
¶33. For these reasons, we find no abuse of discretion in the trial court’s decision to deny Hubbard’s motion for an addi-tur. Accordingly, this issue is without merit.
II. Pretrial Ruling Prohibiting Hubbard from Presenting Medical Evidence That He Suffers from Multiple Sclerosis (MS)
¶ 34. The standard of review for a trial court’s decision to admit or exclude evidence is abuse of discretion. Robinson Prop. Group, L.P. v. Mitchell, 7 So.3d 240, 243 (¶ 9) (Miss.2009). The trial court’s decision will not be reversed unless a substantial right of a party is adversely affected. Id.
¶ 35. On the first day of trial, pri- or to voir dire, Hubbard moved in limine to exclude evidence that he suffered from multiple sclerosis (MS). Delta stipulated to Hubbard’s request, and the trial court sustained Hubbard’s motion. The following morning, after the jury was impaneled, Hubbard sought to withdraw the motion. As the record reflects, the trial court heard from Hubbard’s counsel, James Wetzel, and Delta’s counsel, Robert Wilkinson on the matter:
Wetzel: I was going to ask, if it’s okay with you, I was going to withdraw [the motion], I went back last night and looked at the testimony, the doctor’s testimony. Judge, it’s so intermingled. I want to withdraw my motion in limine on the MS because I think it’s too intertwined to be able to take it out of the doctor’s testimony. Otherwise we would disrupt the whole flow of Dr. Graham’s testimony.
So I have no problem with mentioning the MS, ... because there’s no testimony — I don’t think he’s going to, you know, bring out it’s debilitating or anything of that nature. Can we have that agreement?
Wilkinson: Again, as I said yesterday, Your Honor, our doctor says it has nothing to do with this. The problem is we spent half the night going through everything taking it out, redacting it as Your Honor had suggested, and so we’ve done that. Everything we’ve redacted. Wetzel: I apologize. After we left here, I was getting ready to call you to tell you, look, I think it’s just too intertwined to be able to remove it. I start taking out portions of the doctor’s testimony. I couldn’t get it to flow.
THE COURT: All right. I’m going to let it in by agreement of the parties, and if something pops up, you’ll just have to handle it on cross-examination. Wilkinson: Thank you.
THE COURT: What’s next?
[[Image here]]
Wilkinson: I’ve got one other point I’d like to bring up.
THE COURT: Yes, sir.
Wikinson: Judge, after yesterday’s ruling on the motion in limine filed by the plaintiff on the MS issue, I redacted out of my voir dire any questions to the jurors about multiple sclerosis. That *557 would be an issue that I would want to know[,] do any of the them, has their father, mother, husband, whatever, do they have MS, because [Hubbard] suffers from that.... Now we have put MS back into the case, and I don’t know if any of these thirteen jurors, what their history or background they may [sic] on the issue, and it’s something, Your Hon- or, that I would have asked. It was important enough for me to ask in voir dire had the motion in limine not been filed.
THE COURT: So what are you doing? Are you making some kind of motion now?
Wilkinson: Your Honor, what I’m asking, inquiring, I think it would — I don’t want to get in front of — now that we have a jury, ... I don’t want to get in front of this jury and ask them individual questions.
Perhaps the Court could inquire. If all of them say, no, they don’t have anything to do with that, then we move on. If some of them respond in the affirmative, then that would be a problem.
THE COURT: I’m not going to do that. That motion came up. Both sides agreed to it yesterday that this was not part of the case. This morning both sides agreed again. I am not going to address the issue of multiple sclerosis.
Wilkinson: Your Honor, can I respond?
THE COURT: Yes, sir.
Wilkinson: It was brought back up after voir dire was over by plaintiffs counsel saying — when I was asking questions about surgery and the hip, taking bone from there. And for the first time at the conclusion of voir dire it was brought up by the plaintiff that, hey, I decided that I didn’t want to file that motion after all.
I’m not trying to cause problems, Your Honor, but it’s something that I would have inquired of except for their motion, to which we agreed to and I took it out. So that’s the box we’re in.
THE COURT: So then it’s out. We’ll stand by the ruling that was made yesterday and agreed to yesterday.
[[Image here]]
Wetzel: Judge, he’s already agreed that — he stipulated we can go ahead and bring the MS in. There’s no way to extract it out, Judge, at this point. Here’s the whole thing. I don’t understand what he would ask him about MS, because my client’s got prior shoulder problems, prior back problems. He never asked one question regarding the back or shoulder. He never asked one question. Why would he want to ask about MS, because we’re not claiming MS was caused by this accident Judge. It’s not even an issue.
THE COURT: Mr. Wetzel, I am going to go with yesterday’s ruling that was agreed to. No questions were posed to the jury about MS. Based on that ruling, those medical records are going in, and anything with regard to MS is to be redacted and no mention of multiple sclerosis, period.
Wetzel: We’re going to have to probably take about — I was going to play Dr. Graham’s deposition as the first witness. So I’m going to have to take a break after opening argument to go through with the court reporter to be able to take out and extract what he comes up to that to be able to stop the recorder.
THE COURT: Mr. Wetzel, I made this ruling yesterday. That should have been done last night.
Wetzel: I know, but we just talked about that we both agreed to let it back in, Judge. Otherwise, I would have *558 done that at lunchtime with the court reporter.
[[Image here]]
THE COURT: Do it right now, because once we get started we’re going. We’re in recess.
¶ 36. According to the record, even though the trial court prohibited the parties from mentioning the term “multiple sclerosis,” the court allowed testimony to the fact that Hubbard suffered from a neurological condition. The record testimony contains numerous references to Hubbard’s “neurological condition,” or “neurological disorder,” or “unrelated neurological disorder.”
¶ 37. Still, Hubbard argues that the trial court’s decision unfairly prejudiced his case, as he was not allowed to cross-examine Dr. Bowen effectively with regard to the symptomology of multiple sclerosis. Hubbard contends this forbade the jury from taking into consideration the question of whether the prior symptomologies noted in his various medical records predating the December 2006 accident were from multiple sclerosis or from a herniated disc.
¶ 38. We find no error with the trial court’s decision. As Delta points out, and the aforementioned colloquy reflects, the argument presented to this Court on appeal is not what was presented to the trial court. Hubbard’s stated reason to the trial court for wanting to withdraw his motion to exclude evidence that he suffered from multiple sclerosis was that redacting portions of Dr. Graham’s testimony mentioning multiple sclerosis would “disrupt the flow” of Dr. Graham’s video testimony. The significance of Hubbard’s multiple sclerosis and its symptomology, which Hubbard now claims existed in relation to his case against Delta, was not illustrated in the slightest to the trial court when Hubbard sought to withdraw his motion.
¶ 39. We decline to put the trial court in error on a matter that was not properly presented to it for a decision. Stephens v. Miller, 970 So.2d 225, 227 (¶ 9) (Miss.Ct.App.2007). Accordingly, we find that this issue is procedurally barred.
III. Rule 68
¶ 40. Hubbard does not dispute that Delta made a valid offer of judgment under Rule 68 in the amount of $30,000 prior to trial. But he contends that the “costs” requested by Delta and subsequently awarded by the trial court are not the type of costs contemplated by the rules of civil procedure.
¶ 41. The costs sought by Delta were outlined in its motion for costs, which states, in relevant part:
1. Expert Fees: $4,600.00
2. Copying/Printing Costs: $1,076.10
3. Trial Materials (demonstrative aids, technical support, etc.): $1,084.43
4. Court Reporter: $251.50
5. Travel and Food: $587.08
Total Expenses Incurred Post-Offer: $7,599.11
¶ 42. The trial court awarded Delta costs totaling $7,012.03, disallowing travel and food expenses. Accordingly, the trial court entered an order requiring Hubbard to pay Delta $4,012.03, the net amount of Delta’s total expenses minus the jury verdict.
¶ 43. On appeal, Delta responds by first contending that Hubbard waived any challenge he might have had with regard to the court’s award of expert-witness fees. This is because when asked by the trial court whether such fees could be awarded as costs, Hubbard’s counsel told the trial court that it was within the court’s discretion.
*559 ¶44. As to the other items, Delta acknowledges that Hubbard entered a proper objection on each. But Delta submits that federal courts, ruling on costs under Rule 68 of the Federal Rules of Civil Procedure, have interpreted “costs” to include such items.
¶ 45. This is a case of first impression with regard to Rule 68. Because we are asked to interpret Rule 68, we do so de novo. Miss. Transp. Comm’n v. Fires, 693 So.2d 917, 920 (Miss.1997).
¶46. There is scant Mississippi case law dealing with Rule 68. The rule is patterned after Federal Rule 68. Harbit v. Harbit, 3 So.3d 156, 162 (¶20) (Miss.Ct.App.2009). Mississippi’s version states, in pertinent part, that:
At any time more than fifteen days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued.... If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the cost incurred after the making of the offer.
M.R.C.P. 68.
¶ 47. The purpose of Rule 68, and its federal counterpart, is “to encourage settlements, avoid protracted litigation, and protect the party who is willing to settle from the burden of costs that subsequently come.” Fiddle, Inc. v. Shannon, 834 So.2d 39, 49 (¶ 38) (Miss.2003) (quoting M.R.C.P. 68 cmt.); see also Marek v. Chesny, 473 U.S. 1, 10, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) (“[Federal] Rule 68’s policy of encouraging settlements is neutral, favoring neither plaintiffs nor defendants; it expresses a clear policy of favoring settlement of all lawsuits.”).
¶ 48. In Shannon, our supreme court spoke to the operation of the rule. Citing Delta Air Lines, Inc. v. August, 450 U.S. 346, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981), the Shannon court found that in order to trigger Rule 68’s “cost-shifting procedure[,]” the offeree must obtain a judgment. Shannon, 834 So.2d at 49 (¶39). Shannon held that because the defendant was the prevailing party, the trial court did not err in denying the defendant’s Rule 68 motion. Id.; cf. Johnston v. Stinson, 495 So.2d 1023 (Miss.1986) (holding that the trial court erred in requiring the plaintiff-offeree to pay “court cost” under Rule 68 because the plaintiff obtained a judgment more favorable than the defendant’s offer of judgment); see also Poteete v. Capital Eng’g, Inc., 185 F.3d 804, 806 (7th Cir.1999) (“[Federal] Rule 68 is applicable only to cases the defendant loses.”); La. Power & Light Co. v. Kellstrom, 50 F.3d 319, 333 (5th Cir.1995) (per curiam) (“If a plaintiff takes nothing ... [Federal] Rule 68 does not apply.”).
¶ 49. The term “costs” is not defined in our Rule 68 or its federal counterpart. Neither Shannon nor Johnston addressed the meaning of “costs” under the rule. This Court touched on the subject in Har-bit, but the issue there was limited to the propriety of attorney’s fees having been awarded as costs in a divorce action.
¶ 50. Harbit held that the chancery court erred when it used Rule 68 to award attorney’s fees as part of costs. Harbit, 3 So.3d at 162 (¶20). Relying on federal jurisprudence as persuasive authority, Harbit noted that Marek held “the most reasonable inference” of the meaning of “costs,” in Federal Rule 68, is that the term “was intended to refer to all costs properly awarded under a relevant substantive statute or other authority.” Id. (quoting Marek, 473 U.S. at 9, 105 S.Ct. 3012). Harbit then explained:
*560 We are not aware of any Mississippi statute that authorizes a chancellor to award attorney’s fees, as part of costs, to a prevailing party in a divorce proceeding. While there is plenty of authority authorizing a chancellor, in the chancellor’s discretion, to award attorney’s fees to a party in a divorce action, that authority is decisional law and is based on financial needs of the party. Therefore, we find that the chancellor erred in using Rule 68 to calculate the amount of attorney’s fees awarded....
Id. at (¶ 21) (internal citation omitted).
¶ 51. Federal courts have interpreted “costs” under Federal Rule 68 as referring to those costs ordinarily awarded under Rule 54(d) of the Federal Rules of Civil Procedure. Hedru v. Metro-North Commuter R.R., 433 F.Supp.2d 358, 360 (S.D.N.Y.2006); Thomas v. Caudill, 150 F.R.D. 147, 149 (N.D.Ind.1993) (citing 7 Moore’s Federal Practice § 68.06(3) (3d ed.1997)). In Thomas, the district court opined that the United States Supreme Court indicated in Marek that “the position in Moore’s Federal Practice is the correct definition of ‘costs’ and that the costs which a defendant is entitled to recover under [Federal] Rule 68 are limited to the costs allowable under Federal Rule of Civil Procedure 54(d).” Thomas, 150 F.R.D. at 149. Thomas based its finding on Marek’s comment that “Rule 68 does not come with a definition of costs; rather, it incorporates the definition of costs that otherwise applies to the case.” Id. (quoting Marek, 473 U.S. at 11 n. 2, 105 S.Ct. 3012).
¶ 52. In Delta Air Lines, the Supreme Court indicated that there is an intrinsic link between Federal Rules 68 and 54, stating:
Rule 68 provides an additional inducement to settle in those eases in which there is a strong probability that the plaintiff will obtain a judgment but the amount of recovery is uncertain. Because prevailing plaintiffs presumptively will obtain costs under Rule 54(d), Rule 68 imposes a special burden on the plaintiff to whom a formal settlement offer is made. If a plaintiff rejects a Rule 68 settlement offer, he will lose some of the benefits of victory if his recovery is less than the offer. Because costs are usually assessed against the losing party, liability for costs is a normal incident of defeat.
Delta Air Lines, 450 U.S. at 352, 101 S.Ct. 1146.
¶ 53. In Johnston v. Penrod Drilling Co., 803 F.2d 867 (5th Cir.1986), the Fifth Circuit Court of Appeals, interpreting Delta, also acknowledged the interrelationship between the two rules, and the court noted the following distinction:
Rule 68 is a mandatory rule designed to operate automatically by a comparison of two clearly defined figures. In Delta [,] ... the defendant argued that Rule 68 operated to shift the costs to the plaintiff when the defendant’s $450 offer was rejected and defendant later obtained a take nothing judgment. The [Supreme] Court held that Rule 68 did not operate to shift costs because a take nothing judgment was not a “judgment finally obtained by the offeree.” Our interpretation of Rule 68 is consistent with the teaching of Delta: it is a mandatory rule to be narrowly applied. [Federal] Rule 54(d) gives the district court the necessary discretion to tax costs against the party who should equitably bear them. Rule 68, which provides that the plaintiff must pay costs if its conditions are met, is not such a rule.
Penrod Drilling, 803 F.2d at 870-71.
¶ 54. Federal Rule 54(d) states in relevant part: “Unless a federal statute, these rules, or a court order provides otherwise, *561 costs — other than attorney’s fees — should be allowed to the prevailing party.” Rule 54(d) of the Mississippi Rules of Civil Procedure is patterned after former Federal Rule 54(d), and states in part: “Except when express provision therefor is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs.... ”
¶ 55. As with Rule 68, there is little Mississippi case law dealing with our Rule 54(d). The United States Supreme Court spoke to Federal Rule 54(d) in Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), superseded on other grounds, 42 U.S.C. § 1988 (1991). There, the Court addressed “the power of federal courts to require a losing party to pay the compensation of the winner’s expert witnesses.” Id. at 438, 107 S.Ct. 2494.
¶ 56. Crawford held that “when a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit[ations] [set out] in [28 U.S.C.] § 1821[ ] [and § 1920], absent contract or explicit statutory authority to the contrary.”[4] Id. at 439, 107 S.Ct. 2494. The Supreme Court explained that the term “costs” as used in Rule 54(d) is defined by § 1920, which specifically enumerates expenses that a federal court may tax as costs under that rule. Id. at 441-42, 107 S.Ct. 2494. The Court said, “§ 1821 specifies the amount of the fee that must be tendered to a witness, § 1920 provides that the fee may be taxed as a cost, and [Federal] Rule 54(d) provides that the cost shall be taxed against the losing party unless the court otherwise directs.” Id. at 441, 107 S.Ct. 2494.
¶ 57. Briefly, we note that Federal Rule 54(d) was amended on April 30, 2007, effective December 1, 2007, and the language, “unless the court otherwise directs” was removed. In speaking to former Federal Rule 54(d), the Sixth Circuit Court of Appeals explained that “the discretion that Rule 54(d) gives courts (the ‘unless the court otherwise directs’ proviso) is discretion to decline requests for costs, not discretion to award costs that [28 U.S.C.] § 1920] fails to enumerate.” In re Cardizem CD Antitrust Litig., 481 F.3d 355, 359 (6th Cir.2007) (emphasis added).
¶ 58. In Ezelle v. Bauer Corp., 154 F.R.D. 149, 152 (S.D.Miss.1994), the district court spoke to the operation of Federal Rule 68 in conjunction with Federal Rule 54(d):
The party who prevails in a lawsuit ordinarily recovers costs from the losing opponent pursuant to Rule 54(d) of the Federal Rules of Civil Procedure. However, the award of costs under this Rule is a matter of the court’s discretion, and Rule 54(d) permits the district court, on a showing of good cause, to require a prevailing party to bear its own costs. *562 Delta Airlines [Air Lines][] 450 U.S. [at] 353-56, 101 S.Ct. 1146.... Therefore, the award of costs is not a merely mechanical event and remains, generally speaking, a matter of a district court’s discretion.
However, the district court may be deprived of its discretion under Rule 54(d) where Rule 68 of the Federal Rules of Civil Procedure properly comes into play. [Penrod Drilling,] 803 F.2d [at] 869[.]
¶ 59. The Eleventh Circuit Court of Appeals applied Crawford’s holding in Parkes v. Hall, 906 F.2d 658, 658 (11th Cir.1990), a personal-injury diversity case, where Federal Rule 68 was invoked. The question in Parkes was whether Federal Rule 68, once triggered, obligated the plaintiff to pay costs in addition to those allowed by statute. Id. at 659. Parkes held that “costs which are subject to the cost-shifting provisions of Rule 68 are those enumerated in 28 U.S.C. § 1920, unless the substantive law applicable to the particular cause of action expands the general § 1920 definition.” Id. at 660; see also Knight v. Snap-On Tools Corp., 3 F.3d 1398, 1404 (10th Cir.1993) (holding same); Phillips v. Bartoo, 161 F.R.D. 352, 354 (N.D.Ill.1995) (“absent substantive law authorizing the expansion of § 1920 provisions, Rule 68 ‘costs’ are limited to the definition in § 1920”).
¶ 60. Mississippi does not have a specific statute comparable to that of § 1920, which enumerates all the expenses a court may tax as costs.[5] Rather, items that may be taxed as costs can be found throughout the Mississippi Code.[6]
¶ 61. Other states with procedural rules similar to ours have concluded that costs under their own respective version of Rule 68 are limited to those costs allowable under their version of Rule 54(d). The Court of Appeals of Indiana, in interpreting the term “costs” under Indiana Trial Rule 68, which is almost identical to our Rule 68, said the following: “ ‘Cost’ is a term of art with a specific legal meaning, and we must presume that it was used consistently absent evidence of a contrary intent by the drafters.” Missi v. CCC Custom Kitchens, Inc., 731 N.E.2d 1037, 1039 (Ind.Ct.App.2000). The Missi court held that there is nothing “on the face of T.R. 68 to indicate that the drafters intended a more expansive definition of ‘costs’ than its traditional meaning as embodied in [Indiana Trial Rule] 54(D).... ” Id.[7]
¶ 62. The Supreme Court of Appeals of West Virginia, in Carper v. Watson, 226 W.Va. 50, 697 S.E.2d 86, 95 (2010), held that:
the “costs” that may be assessed against a plaintiff under West Virginia Rule of Civil Procedure 68(c) include only those expenses defined as “costs” by statute. Typically, costs under Rule 68(c) will be limited to “court costs,” i.e., the costs *563 taxable under West Virginia Rule of Civil Procedure 54(d).[8]
¶ 63. We find the logic and reasoning behind the foregoing interpretations persuasive. There being no express indication in the rules of civil procedure, or controlling case law, to the contrary, this Court must presume that the drafters of Rule 68 intended for the term “costs” to be used consistent with Rule 54(d). Therefore, we hold that the costs for which Delta is entitled to recover under Rule 68 are limited to those costs allowable under Rule 54(d). The operation of Rule 68 in this case simply made it mandatory, rather than discretionary, for the trial court to impose upon Hubbard the costs allowed under Rule 54(d) after Delta made its offer of judgment.
¶ 64. But that does not end our analysis. As with Rule 68, Rule 54(d) does not expressly define what constitutes “costs.” Rather, as previously mentioned, Rule 54(d) states in part: “Except when express provision therefor is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs....” Here, there is no underlying, substantive statute with a cost provision contained therein that forms the basis of Hubbard’s case, as it is predicated on common-law negligence. That no such statute governs in this instance means that the trial court was limited to the usual statutory costs. We explain.
¶ 65. Historically, costs were unknown at common law. Alyeska Pipeline Serv. Co. v. Wilderness Soc’y, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); see also Vincennes Steel Corp. v. Miller, 94 F.2d 347, 348 (5th Cir.1938) (“Costs, as we know them today, were unknown to the common law, and, without the aid of statute, liability therefor rests only upon the party incurring them, as for any other debt.”). Thus, “[c]osts are generally allowable only when authorized by statute or court rule.” 20 C.J.S. Costs § 3 (2007).
¶ 66. In Martin v. McGraw, 249 Miss. 334, 340, 161 So.2d 784, 786 (1964), our supreme court stated that courts of equity have “no inherent jurisdiction to award costs independently of statute.” The supreme court reiterated this principle in Ex parte Ashford, 253 Miss. 768, 179 So.2d 192 (1965). There the court held:
(1) The cost alleged to be due the circuit clerk is cost growing out of many ‘state fail’ cases, but since Mississippi Code Annotated Section 3952(d) (1956) prevents an allowance to the circuit clerk by this Court of a sum in excess of the sum set out in the statute, we cannot allow additional cost over and above the amount set out in the law.
(2) This Court has no implied or inherent power to award cost, and may allow only such cost as the Legislature may expressly permit or direct to be awarded by the Court in acts of the Legislature. Martin v. McGraw, 249 Miss. 334, 161 So.2d 784 [ (1964) ]; 20 C.J.S. Costs § 2 (1940).
Id. at 768-69, 179 So.2d at 192.
¶ 67. In Board of Trustees of Hattiesburg Municipal Separate School District v. Gates, 467 So.2d 216, 218 (Miss.1985), the supreme court held that the transcription costs submitted by a freelance-court reporter, and already prepaid by a school board, were statutorily set and, thus, “limited thereby.” Finding that the court reporter had charged an appearance fee, which the statute made no provision for, the supreme court remanded the matter *564 back to the chancery clerk for retaxation of costs. Id. at 219. In its discussion, the supreme court parenthetically referred to § 1920. See id. at 218 (noting that in the federal courts, “items to be taxed as costs under 28 U.S.C. § 1920 must be within express language of statute”).
¶ 68. In Aeroglide Corp. v. Whitehead, 433 So.2d 952, 952-53 (Miss.1983), due to a mistrial caused by defense counsel’s improper cross-examination, the trial court awarded $14,784.51 to the plaintiffs “for expenses incurred in preparation of trial pursuant to its inherent authority to control the proceedings before it and the conduct of the participants therein.” The Mississippi Supreme Court reversed and remanded the case to the trial court for assessment of the “usual and statutory costs” against the defendants. See id. at 953 n. 2 (acknowledging that the defendants were “liable for the full amount of statutory costs incurred up until the time the mistrial was declared”). Id. The Whitehead court stated:
We agree with the learned trial judge that all courts possess the inherent authority to control the proceedings before them including the conduct of the participants. However, an examination of our holding in Newell v. State, 308 So.2d 71 (Miss.1975) lends no support for the action taken by the trial court in the case sub judice.

Id.

¶69. The aforementioned Mississippi cases are very instructive in that their holdings are consistent with the general language found in the comment to Rule 54(d),[9] a portion of which states: “costs represents those official expenses, such as court fees, that a court will assess against a litigant.” We now examine the items awarded as costs in this case.
A. Expert Fees
¶ 70. As a general rule, “[flees for expert witnesses, beyond the ordinary fees authorized for witnesses ..., are not taxable as costs unless there is a statute specifically allowing such an expense.” 20 C.J.S. Costs § 123 (2007). There are a number of Mississippi statutes that allow for expert-witness fees to be taxed as costs *565 in certain cases.[10] None, though, apply in this case.
¶ 71. Rule 706 of the Mississippi Rules of Evidence gives our trial courts general authority to appoint expert witnesses and provide for their compensation. But it is inapplicable because Delta’s expert witness was not court appointed.
¶ 72. What is applicable is Mississippi Code Annotated section 25-7-47 (Rev. 2010), one of Mississippi’s fee statutes. Section 25-7-47 is Mississippi’s counterpart to § 1821, the federal statute discussed in Crawford, and it authorizes witness fees. The statute provides that witnesses in the county, circuit, and chancery courts shall receive $1.50 per day in attendance fees and five cents per mile to and from the court.[11] Miss.Code Ann. § 25-7-47.
¶ 73. This being the statutory limit allowed by law, we hold that Hubbard may not be taxed with costs in excess thereof with respect to Delta’s expert witness.
¶ 74. As to Delta’s assertion that Hubbard waived his challenge on this point, it is not well taken. Hubbard’s counsel merely informed the trial court, albeit inaccurately, what he believed the law to be. The law does indeed afford our trial courts some discretion with regard to litigation expenses that a litigant must ordinarily bear. But that discretion is very limited.
¶ 75. The comment to Rule 54(d) states in relevant part: “Absent a special statute or rule, or an exceptional exercise of judicial discretion, such items as attorney’s fees, travel expenditures, and investigatory expenses will not qualify either as statutory fees or reimbursable costs.” This language is congruent with the supreme court’s longstanding view with respect to attorney’s fees and litigation expenses. See Grisham v. Hinton, 490 So.2d 1201, 1205 (Miss.1986) (“With the sole exception of punitive damages cases, in the absence of contractual provision or statutory authority therefor, this Court has never approved awarding trial expenses and attorney’s fees to the successful litigant.”); see also Smith v. Dorsey, 599 So.2d 529, 550 (Miss.1992) (opining that such expenses are analogous to the grant of punitive damages); but see Universal Life Ins. Co. v. Veasley, 610 So.2d 290, 295 (Miss.1992) (where the supreme court carved out a narrow exception to the general rule and held that attorney’s fees “and the like” may be awarded in cases where an insurer wrongly denies a claim even though the party’s conduct does not warrant punitive damages).
¶ 76. In Allred v. Fairchild, 916 So.2d 529, 532-33 (¶¶ 9-12) (Miss.2005), the supreme court applied the Veasley exception in a breach-of-contract case and upheld an award of accounting fees to the plaintiff because the defendant, who had entered into a confidential business relationship with the plaintiff, had actively engaged in fraud and deceit throughout the parties’ business dealings. Relying on the comment to Rule 54(d),. the supreme court said, “[exceptional circumstances must exist in order for the court to exercise excep *566 tional judicial discretion” under Rule 54(d). Allred, 916 So.2d at 532 (¶ 10) (indicating that such exceptional circumstances must be shown in the record).
¶ 77. We find no exceptional circumstances, as contemplated by Veasley and Allred, present in this case. Nor do we find that Hubbard waived this point of contention.
B. Copying/Printing Costs, Trial Materials, Court Reporter
¶ 78. We know of no statutory authority or court rule that authorizes these items to be awarded as ordinary costs. The copying expenses sought by Delta in this case are considered office expenses of an attorney and are not recoverable. See, e.g., 20 C.J.S. Costs § 109 (2007). The expenditures made for the demonstrative aids used at trial and the professional technical assistance employed by Delta for help in the courtroom are likewise not recoverable as ordinary costs. See, e.g., 20 C.J.S. Costs § 115 (2007). And with regard to the court reporter fee, the record indicates that it is for the deposition taken of Hubbard’s wife, Denise, prior to trial. Rule 30(h) of the Mississippi Rules of Civil Procedure says: “No part of the expenses of taking depositions, other than serving of subpoenas, shall be adjudged, assessed or taxed as court costs.” Accordingly, this too is not a recoverable cost item.
¶79. We point out that Delta relied exclusively on federal case law interpreting the federal counterpart to Rule 68 in support of its argument as to what items may be taxed as costs. As previously indicated, we find the interpretations of those authorities persuasive with respect to the operation of Rule 68. There is no distinction between the mechanics of our Rule 68 and Federal Rule 68; they are the same, Shannon, 834 So.2d at 49 (¶ 39), and the federal courts are well versed with this aspect of the rule.
¶ 80. But such cases offer little assistance for determining the specific items that may be taxed as costs under state law. See, e.g., Carper, 697 S.E.2d at 95 n. 4 (same finding). The federal courts “necessarily base their analysis on ... § 1920,” a statute that is not applicable to Mississippi’s law of costs.[12] See, e.g., id. (stating that § 1920 is inapplicable to West Virginia’s law of costs).
¶ 81. Even though the Mississippi Supreme Court referenced § 1920 in Gates, it did so merely to illustrate that the federal courts, not unlike Mississippi courts, *567 award costs only permitted by statute. See Gates, 467 So.2d at 218. In no way did the Gates court apply § 1920 to the case.
¶ 82. In Missi, the Indiana case mentioned above, cost items similar to those authorized by § 1920 were awarded by an Indiana trial court apparently because Indiana Trial Rule 68 had been invoked, as the following portion from the Missi court’s opinion illustrates:
In support of their argument that the award of litigation expenses should be affirmed, [the appellees] cite Thomas, wherein the [federal] district court held that the defendant whose offer of judgment had been rejected could recover for photocopy expenses, subpoena and mileage fees, and deposition fees. 150 F.R.D. at 150. The Thomas court relied in part upon Justice Brennan'S' dissent in Marek, in which he opined that “ ‘costs’ as that term is used in the Federal Rules should be interpreted uniformly in accordance with the definition of costs set forth in § 1920.” 150 F.R.D. at 148 (citing Marek, 473 U.S. at 18, 105 S.Ct. 3012, ... (Brennan, J., dissenting)). [Section] 1920 enumerates among recoverable costs the “[f]ees and disbursements for printing and witnesses,” and “[flees for exemplification and copies of papers necessarily obtained for use in the case.”
Missi, 731 N.E.2d. at 1040.
¶ 83. In response, the Missi court explained that Indiana courts “may award costs only when they are expressly authorized by statute.” Id. (quoting Board of County Comm’rs of Vanderburgh County v. Farris, 168 Ind.App. 309, 342 N.E.2d 642, 644 (1976)). The Missi court reiterated that Indiana courts “have no inherent power to assess or award costs to a prevailing party” and stated that “[t]he right to recover costs is a matter left entirely to [Indiana’s] legislature.” Id. (citing Linder v. Ticor Title Ins. Co. of Cal., 647 N.E.2d 37, 40 (Ind.Ct.App.1995)). The Missi court then held that the costs awarded by the trial court were not the sort of costs contemplated by Indiana Trial Rule 54(D) and reversed the trial court’s award of such items. Id.
¶ 84. A similar type argument was made to the Court of Appeals of Tennessee in the case of Person v. Fletcher, 582 S.W.2d 765, 766 (Tenn.Ct.App.1979), where the court was “urged to declare certain items as costs under Rule 68 [of the Tennessee Rules of Civil Procedure,] [because] to hold otherwise Rule 68 will provide no deterrent to the unreasonable prosecution of nuisance value cases.”
¶ 85. Rejecting it, the Person court said:
While Rule 68, T.R.C.P., [i]s patterned after Federal Rule 68, this state has not enacted a law comparable to the federal law found at ... § 1920, which expressly empowers the judge or clerk of any court of the United States to tax certain enumerated items as cost. This federal statute is the controlling distinction between Rule 68, T.R.C.P., and the federal rule insofar as what may be included as items of costs.
What constitutes costs is determined from legislative enactment on the subject and this principle is expressed in American Jurisprudence, vol. 20, Costs, [§ ] 52:
Inasmuch as the recovery of costs is dependent on statutory provision, a party who has been adjudged to be entitled to recover or tax costs may include in his bill or memorandum only such items of expense as are taxable by virtue of legislative enactment.
*568 The Supreme Court in the case of [Louisville & N.] Railroad [Co.] v. Boswell, 104 Tenn. 529, 58 S.W. 117 (1900), overruling an effort to include a fee as costs not authorized by statute and quoting its earlier case of Mooneys v. [State], 10 Tenn. 578, [ (1831),] tersely stated: “costs are created by statute; unless there be some law to authorize it, the Court cannot Ex officio give costs against any one.” At common law, costs were not recoverable Eo nomine, 20 C.J.S. Costs [§ ] 2. In the absence of statute expressly designating the claimed items as costs, we hold the costs referred to in Rule 68, T.R.C.P., are those costs authorized by statute as assessed by the trial court in this case.
Id. at 766-67. (emphasis added).
¶ 86. And in Carper, it was argued “that limiting the types of ‘costs’ recoverable under Rule 68(c) to ‘court costs’ undermines the purpose of the rule, because such limitation reduces the economic risk to a plaintiff who refuses an offer of judgment, thereby diminishing the incentive to agree to such offers.” Carper, 697 S.E.2d at 95. The Carper court replied:
While the [a]ppellees’ policy argument may be compelling, this [c]ourt has no authority to sanction the taxation of costs which are not permitted by statute or court rule. Indeed, as previously noted, prohibition will lie against a circuit court that awards costs not specifically allowed by statute or court rule. Consequently, any expansion of the “costs” that may be assessed against a plaintiff pursuant to Rule 68(c) must be left to the [legislature or be expanded by this [c]ourt through a new judicial rule.

Id.

¶ 87. We find the holdings in Martin, Ex parte Ashford, Gates, and Whitehead are indicative that the Mississippi Supreme Court’s view on the matter is in line with that held in Missi, Person, and Carper.
¶ 88. Also, we point out that one of the cases relied on by Delta in support of its argument, arguing that we should affirm the trial court’s cost award, involved an action under Title VII of the Civil Rights Act of 1964, which therein contains a provision for attorney’s fees, authorizing courts to award reasonable fees and expenses. See, generally, 42 U.S.C. § 2000e-5(k) (2006). Certainly, when a statute allowing for litigation expenses applies to the case, the types of “costs” awarded will differ significantly compared to a case where a trial court (whether it be a state or federal court) is relegated to the usual statutory costs. Such would have been the circumstances had this case involved, for example, a trespass-to-timber action under section 95-5-10(3) (see n. 10).
¶ 89. Survey of the case law dealing with Rule 68, in general, reveals that litigants often rely on incommensurable cases for support of cost items they contend should be awarded simply because Rule 68 was invoked. See, e.g., Crossman v. Marcoccio, 806 F.2d 329, 331 (1st Cir.1986) (describing Federal Rule 68 as “the most enigmatic of the Federal Rules of Civil Procedure,” partly for this reason). Respectfully, the bench and the bar should keep this in mind.
¶ 90. In conclusion, having found the aforementioned cost items awarded by the trial court to Delta in this case unauthorized by Mississippi law, we must reverse on this issue and remand this case to the trial court for further proceedings consistent with this opinion.
¶ 91. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEED-
*569 INGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TWO-THIRDS TO THE APPELLANT AND ONE-THIRD TO THE APPELLEE.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.

. Hubbard suffers from multiple sclerosis. As will be explained in our discussion of the issues, the jury was not told the name of this condition.

. Section 41-9-119 states: "Proof that medical, hospital, and doctor bills were paid or incurred because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or incurred were necessary and reasonable.” Miss.Code Ann. § 41-9-119.

. Dr. Bowen testified earlier that he had received many referrals from Dr. Graham.

. Section 1821(b) currently provides that a witness shall be paid an attendance fee of $40 per day and shall be paid a mileage allowance in the amount prescribed by the Administrator of General Services. 28 U.S.C. § 1821(b) (2006).
Section 1920 states in relevant part:
A judge or clerk of any court of the United States may tax as costs the following:
(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.
28 U.S.C. § 1920 (2008).

. In Mississippi, an award of court costs is considered an act of court; the taxation of costs, generally, is performed by the clerk after the termination of the case, and it is considered a ministerial act. Bacot v. Holloway, 140 Miss. 120, 105 So. 739 (1925).

. Mississippi Code Annotated section 11 — 53— 65 (Rev.2002) provides:
When a cause shall be determined, the clerk of the court, and the justice of the peace in cases had before him, shall tax the costs of the case and make out a bill thereof, specifying therein each section of the law, and each paragraph or subdivision of section, if any, by virtue of which each fee or item of costs therein is charged or taxed, and he shall file the same with the papers in the cause.

. Our Rule 54(d) is essentially identical to Indiana Trial Rule 54(D).

. Our Rule 54(d) and West Virginia Rule of Civil Procedure 54(d), likewise, are essentially the same.

. The full comment to Rule 54(d) provides:
Three related concepts should be distinguished in considering Rule 54(d): These are costs, fees, and expenses. Costs refers to those charges that one party has incurred and is permitted to have reimbursed by his opponent as part of the judgment in the action. Although costs has an everyday meaning synonymous with expenses, taxable costs under Rule 54(d) is more limited and represents those official expenses, such as court fees, that a court will assess against a litigant. Costs almost always amount to less than a successful litigant's total expenses in connection with a law suit and their recovery is nearly always awarded to the successful party. See Miss.Code Ann. § 11-53-27 (1972) (successful party to recover costs, generally).
Fees are those amounts paid to the court or one of its officers for particular charges that generally are delineated by statute. Most commonly these include such items as filing fees, clerk’s and sheriff’s charges, and witnesses' fees. In most instances an award of costs will include reimbursement for the fees paid by the party in whose favor the cost award is made.
Expenses include all the expenditures actually made by a litigant in connection with the action. Both fees and costs are expenses but by no means constitute all of them. Absent a special statute or rule, or an exceptional exercise of judicial discretion, such items as attorney's fees, travel expenditures, and investigatory expenses will not qualify either as statutory fees or reimbursable costs. These expenses must be borne by the litigants. 10 Wright & Miller, [Federal Practice and Procedure, Civil] § 2666 [(1973)]. See also 6 Moore’s Federal Practice ¶¶ 54.01-43 (1972).
M.R.C.P. 54 cmt.

. See, e.g., Mississippi Code Annotated section 95-5-10(3) (Rev.2004), providing that, in trespass-to-timber suits, "[a]ll reasonable expert witness fees and attorney's fees shall be assessed as court costs in the discretion of the court.”

. These have been the rates in Mississippi since the year 1857. See Miss. Rev.Code (1857), p. 148, Ch. 8, Art. 1. The preceding rates, promulgated by the Legislature in 1837, were $2.00 per day and six cents per mile. See Hutchinson’s Mississippi Code (1798-1848), p. 870, Ch. 608, Art. 13, "An Act to Increase the Compensation of Jurors and Witnesses.”

. We note the following explanation that Crawford provided with regard to § 1920:
In 1793 Congress enacted a general provision linking some taxable costs in most cases in federal courts to the practice of the courts of the [sítate in which the federal court sat. Act of Mar. 1, 1793, § 4, 1 Stat. 333. This provision expired in 1799. Apparently from 1799 until 1853 federal courts continued to refer to state rules governing taxable costs. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 250, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). By 1853 there was a "great diversity in practice among the courts” and "losing litigants were being unfairly saddled with exorbitant fees.” Id. at 251, 95 S.Ct. 1612. Accordingly, Congress returned to the issue and comprehensively regulated fees and the taxation of fees as costs in the federal courts. The resulting 1853 Fee Act "was a far-reaching Act specifying in detail the nature and amount of the taxable items of cost in the federal courts.” 421 U.S. at 251-252, 95 S.Ct. 1612.
[[Image here]]
The sweeping reforms of the 1853 Act have been carried forward to today, "without any apparent intent to change the controlling rules.” Alyeska Pipeline, supra at 255, 95 S.Ct. at 1620. Title 28 U.S.C. § 1920 now embodies Congresses] considered choice as to the kinds of expenses that a federal court may tax as costs against the losing party[.]
Crawford, 482 U.S. at 439-40, 107 S.Ct. 2494.